UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | CRIMINAL NO. 3:19CR199(SRU) |
| STEVEN FINKLER | : | FEBRUARY 8, 2021 |

# DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Steven Finkler, through counsel, respectfully submits this memorandum as an aid to the Court for sentencing. Part I of this memorandum presents the factual background and an overview of this case; Part II discusses an objection to an enhancement in the Presentence Report (PSR) under the sentencing guidelines; Part III discusses the Sentencing Guidelines in relation to this case; Part IV discusses Mr. Finkler's bipolar disorder; and Part V discusses the appropriate sentence in this case.

**Part I – Background and Overview**

There is no magic bullet here. There is no vaccine or dose of hydroxychloroquinne that we can give Steven Finkler to make him better, to immunize him or cure him from the urges to commit fraud. The defense points this out because it is human nature to *want* such a remedy. It is deeply unsatisfying to be confronted with a problem that repeats itself, but does not offer a clear solution. But, that is the situation in which we find ourselves. There are no easy answers here, and attempts to devise them are unlikely to be either fruitful or consistent with the law. It's well to turn our attention to basics and focus on what the law provides. The guiding principle that applies in all cases -- hard ones and easy ones -- is that the sentence should be "sufficient, but not greater than necessary" to achieve the goals of a criminal sentence. 18 U.S.C. § 3553(a).

That statutory principle restrains the impulse to think that a very long sentence achieves justice by meeting the statutory goals of punishment, retribution, incapacitation, and deterrence. Certainly,

locking Mr. Finkler up for a very long time would punish him, incapacitate him and deter him, but if his imprisonment is for a day longer than necessary, the sentence would not constitute "just punishment," as the sentencing statute requires, and it would not comport with parsimony clause. Put differently, the Second Circuit explained the sentencing court's obligation quite succinctly in *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006). There, the court explained that if a shorter sentence would accomplish the goals of a criminal sentence as well as a longer one, the [sentencing] court must choose the shorter. *See id* at 142 (where a Guideline sentence is "in equipoise with [a] below-the-range sentence," parsimony clause requires imposition of the lower sentence).

So that is the rub in this case. Where is that point at which the sentence serves the goals of a criminal sentence without becoming greater than necessary?

We can start with the idea that Mr. Finkler has mental health issues. He has bipolar disorder type II. PSR, ¶ 80; Ex. F, pp. 1-9, 11-12, 14-17, 19. His diagnosis has been elusive for years, and at times, the BOP thought his bipolar disorder was "resolved." Ex. F, pp. 12, 19. Bipolar disorder, however, does not simply go away. It has no cure. Doctors treat it and manage it with medication and psychotherapy. It does not simply "resolve."

Bipolar disorder type II is not a less severe form of the disease than type I. That is a misconception that has been rejected in the literature regarding the disorders. *See* Part IV, below. Indeed, bipolar type II can be *more* debilitating because there can be longer periods of depression. The diagnosis of bipolar II here is relevant because the disease has traits that are clearly present in Mr. Finkler's behavior in this case. In particular, the disease is characterized by increased risk taking without regard to consequences. Mr. Finkler opened chip reader accounts that fed directly into a credit union account in his own name. It did not take a master sleuth to solve this crime. The evidence suggests Mr. Finkler did not care if he got caught.

As discussed in detail in Part IV of this memorandum, bipolar disorder can be treated. The typical approach is a combination of pharmacology, particularly involving mood stabilizers or mood elevators like quentiapine or lithium, and psychotherapy. A diagnosis of bipolar disorder is not an uncommon diagnosis, and thousands of people are successfully treated for bipolar disorder every day. Jail is not the only option to protect the public from future crimes of those suffering from this illness. Treatment can work, and close monitoring of the treatment while on supervision would help to ensure that Mr. Finkler stays on his medications and stays engaged in psychotherapy.

Another thing to consider in this case is Mr. Finkler's age. Mr. Finkler is about to turn 57. Incarceration is more difficult as people age. The Inspector General of the BOP found that the BOP was not effective in managing the needs of older inmates. *See* US Department of Justice Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015). Now the problems of aging inmates and those in need of treatment are complicated by the pandemic. Simply put, prisoners are serving much more difficult terms of incarceration during the pandemic because prison conditions have become more restrictive and harsh. In an effort to stop the spread of the virus in the congregate living environment of the prisons, wardens have resorted to locking inmates in their cells for as much as 23 hours per day, terminating programming, and eliminating social visits. Even with the much awaited vaccine on the way, these conditions are likely to be enforced for a long time, as prisons cannot isolate themselves from people from the outside who will not have immediate access to the vaccine. In other words, people come into the prison every day who will not be deemed essential workers, and therefore, will have to wait for a long time to be vaccinated. And, sadly, new variants of the virus are spreading. It is not clear that the vaccine will protect against those variants, and the virus may mutate faster than the vaccine manufacturers can adapt.

Prisons rely on outside vendors.  Vendors supply food, and they are needed for construction projects and facility maintenance.  They include electricians, plumbers, carpenters, doctors, nurses, dentists, Internet and telephone providers, members of the clergy, and suppliers of food and building materials.  Also, prisoners' family members will want to visit, and unless they are frontline workers, it will be months and months before they are fully vaccinated.  To minimize the risk of exposure to outside carriers of the virus, prisoners will continue to be in lockdown status without social visits for a significant period of time.  Mr. Finkler has experienced those conditions while locked down at Wyatt since the beginning of the pandemic.  And those conditions did not help in his case.  He contracted the virus while at Wyatt.  Ex. E.

Additionally, older offenders also recidivate at a much lower rate than younger offenders.  Mr. Finkler will likely be in his 60's when he is released from his sentence.  The reconviction rate for men over 60 is 9.4%.  This contrasts sharply with the recidivism rate for men in their 20s, for example, which is 48.6%.  *See* United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (December 2017), at A-40.

All of this is to say that Mr. Finkler has a long, punitive road ahead of him.  Conditions of confinement, due to the pandemic and due to his age, will make any sentence he receives more challenging and difficult than it would be in pre-pandemic times for a younger man.

**Part II – Sentencing Guidelines and Defendant's Objection to an Enhancement**

The Court must, of course, consider the sentencing guidelines.  The defendant submits that they are of limited utility in this case.  As this Court has observed in the past, the guidelines are particularly problematic in the fraud context.  In addition, and as will be discussed below, Mr. Finkler's case is not typical in several ways.  But, since the guidelines must be considered and calculated correctly as a starting point, the defendant raises the challenges set forth below to the

application of one enhancement (for breeding a means of identification to obtain another means of identification). In doing so, however, the defendant reiterates that regardless of which way the Court ultimately decides to calculate the guidelines, the guidelines are not very useful in determining a sentence in this particular case.

**A. The enhancement for breeding does not apply in this case.**

The presentence report ("PSR") increases Mr. Finkler's guideline range by two levels for use of a means of identification to obtain other means of identification. This phenomenon is known as breeding, and it does not apply in this case.

The defendant objects to the two level enhancement under USSG §2B1.1(b)(11)(C)(i) in paragraph 38. As stated in the PSR: The defendant utilized unauthorized means of identification (specifically, the name and date of birth of George Trimis), to unlawfully obtain other means of identification (the Healthtrax membership card, the GT Limited account with Squared-Up and/or the GT Limited LLC account with Clover/First Data). Per USSG §2B1.1(b)(11)(C)(i),[1] two levels are added.

The enhancement does not apply because none of the listed items is properly considered to be a "means of identification."

---

[1] U.S.S.G. 2B1.1(11):

> (11) If the offense involved (A) the possession or use of any (i) device-making equipment, or (ii) authentication feature; (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature; or (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12. (highlight added).

**1. None of the three items mentioned in the PSR is a "means of identification."**

There are four reasons why the club membership and payment processor numbers identified in the PSR are not "means of identification." First, they do not match any of the examples in 18 U.S.C. § 1028. Second, they do not match the examples given in the commentary to U.S.S.G. § 2B1.1(b)(1). Third, at least with respect to the GT Limited accounts with Squared Up and Clover, GT Limited is not a real person, as required in the guidelines definition of "means of identification." Finally, if the issuance of any kind of customer or transaction number resulting from a use of the initial means of identification qualifies for this enhancement, then it has no meaning – in today's digital age, virtually any use of a name, date of birth, or Social Security number or credit or debit number in a commercial transaction will create one or more numbers – customer IDs, specific transaction IDs, serial numbers of purchased items. They cannot all be "means of identification."

**a. The examples in Section 1028 do not explicitly cover the items in question here, and even though the list is not exhaustive, they are all of a type that is different from the numbers Mr. Finkler obtained.**

The commentary to 2B1.1, Application Note 1, "Definitions" states that "'Means of identification'" has the meaning given that term in 18 U.S.C. § 1028(d)(7).[2]

In turn, 18 U.S.C. Sec. 1028(d)(7) states:

> (7) the term "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any—
>
> (A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration

---

[2] With the exception that "such means of identification shall be of an actual (i.e., not fictitious) individual, other than the defendant or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct)."

> number, government passport number, employer or taxpayer identification number;
> (B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;
> (C) unique electronic identification number, address, or routing code; or
> (D) telecommunication identifying information or access device (as defined in section 1029(e)).

As an initial matter, none of the enumerated examples in the statute covers the materials Mr. Finkler obtained – essentially file numbers for his business contracts with the gym and the payment processors. The list in Section 1028 is not exhaustive, but they all have some salience beyond merely being a file number. In particular, they are all forms of identification that would normally be used by or accessible to third parties, including loan numbers that would be part of a credit history. In *United States v. Sash*, 396 F.3d 515, 524 (2d Cir. 2005), the Second Circuit held that a fake police badge or even just a badge number can be a means of identification, but again, that is a number that is normally used to identify a person to the public or third parties; membership numbers, in contrast, identify customers to the companies that serve them.

Here, the gym membership and payment processing account numbers are simply used to identify a customer to the business with which the customer already has an account. As noted in the commentary,

> Subsection (b)(11)(C) implements the directive to the Commission in section 4 of the Identity Theft and Assumption Deterrence Act of 1998…. This subsection focuses principally on an aggravated form of identity theft known as "affirmative identity theft" or "breeding", in which a defendant uses another individual's name, social security number, or some other form of identification (the "means of identification") to "breed" (i.e., produce or obtain) new or additional forms of identification.

U.S.S.G. § 2B1.1, Commentary, "Background."

What Mr. Finkler did was not in any way "breeding."

**b. Similarly, the examples in the guidelines' commentary also show no intention to capture these kinds of numbers.**

The commentary to 2B1.1, Application Note 10, gives examples of what acts do or do not fall under Subsection (b)(11)(C)(i):

> (ii) Examples.—Examples of conduct to which subsection (b)(11)(C)(i) applies are as follows:
>
> (I) A defendant obtains an individual's name and social security number from a source (e.g., from a piece of mail taken from the individual's mailbox) and obtains a bank loan in that individual's name. In this example, the account number of the bank loan is the other means of identification that has been obtained unlawfully.
>
> (II) A defendant obtains an individual's name and address from a source (e.g., from a driver's license in a stolen wallet) and applies for, obtains, and subsequently uses a credit card in that individual's name. In this example, the credit card is the other means of identification that has been obtained unlawfully.
>
> (iii) Non-Applicability of Subsection (b)(11)(C)(i).—Examples of conduct to which subsection (b)(11)(C)(i) does not apply are as follows:
>
> (I) A defendant uses a credit card from a stolen wallet only to make a purchase. In such a case, the defendant has not used the stolen credit card to obtain another means of identification.
>
> (II) A defendant forges another individual's signature to cash a stolen check. Forging another individual's signature is not producing another means of identification.

Neither of the applicable examples is what Mr. Finkler did. Instead, the numbers in question are most similar to the example in the commentary of a non-covered meaning. The gym membership and the payment processes were means to facilitate other frauds, but in and of themselves they were simple commercial transactions like the credit card purchase in the non-covered scenario in the

commentary. That is what happened here.[3] Finkler purchased two types of services – a gym membership, and payment processing services. The numbers the PSR refers to are simply account numbers that are needed to supply those services. Just as Amazon or other online retailers create unique identifiers for each purchase (and each shipment of purchased goods), virtually all business transactions generate transaction records with unique numbers.

**c. The means of identification has to be of an actual person.**

The guidelines define the term "means of identification." Application Note 1 to U.S.S.G. § 2B1.1 provides:

> "Means of identification" has the meaning given that term in 18 U.S.C. § 1028(d)(7), except that such means of identification shall be of an actual (i.e., not fictitious) individual, other than the defendant or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct).

"GT Limited" is, of course, not an actual person. So it cannot be a means of identification as the guidelines construe that term. Accordingly, GT Limited cannot support the enhancement since it is not a means of identification.

**d. The enhancement cannot be so broad as to include any purchase as a means of identification or the enhancement really has no meaning.**

The interpretation of what constitutes a means of identification is a "commonsense" one. *United States v. Melendrez*, 389 F.3d 829, 835 (9th Cir. 2004). When any purchase can create a unique number that can identify the transaction, or merely identify a customer to a vendor, which is then counted as a means of identification, this is not a commonsense definition. Purchases made on Square or Clover in this case did not rely on GT Limited as a means of identification. The transactions were really more akin to the examples in the guideline commentary of transactions that do not trigger

[3] In fact, Mr. Finkler apparently paid for the services – his gym membership account was current when it was closed, per the discovery.

the enhancement – the use of a stolen credit card or a forgery to a check. And the Healthtracks gym membership identification card did not facilitate the transaction. It simply put Mr. Finkler in the room where he could take the credit cards. The guideline enhancement is aimed at "breeding." What he did was not in any way, shape, or form what the guideline drafters were trying to punish.

**Part III – Sentencing**

**1. There is No Presumption of Correctness to a Guidelines Range.**

The Guidelines are advisory and in no sense does a Guidelines calculation engender a presumption that the attendant sentence is appropriate, let alone required. *See, e.g., United States. v. Davis* , No. 07 Cr. 727, 2008 WL 2329290, at *4 (S.D.N.Y. June 5, 2008) (citing *Gall v. United States*, 552 U.S. 38, 45 (2007)). In fact, courts "may not presume that the Guidelines range is reasonable" at all or that only "extraordinary circumstances . . . justify a sentence outside the Guidelines range." *United States v. Cavera*, 550 F.3d 180, 189, 199 (2d Cir. 2008) (quoting *Gall*, 552 U.S. at 47); *see Nelson v. United States*, 555 U.S. 350, 350 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable."); *Rita v. United States*, 51 U.S. 338, 351 (2007) ("sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."). While the Court is instructed to use the Guidelines as an initial benchmark, they are only "one factor among several" that the Court should consider, and can and should play no role in the sentencing decision when doing so would undermine Federal sentencing objectives. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

**2. The Fraud Guidelines Do Not Suggest a Reasonable Sentence in this Case.**

The guidelines in this case are driven primarily by the loss table of the fraud guideline in U.S.S.G. § 2B1.1. The loss table increases the offense level by 10 levels in this case. The fraud guidelines in general rely on that loss table and consequently put too much emphasis on the dollar

amount of the loss. That misguided emphasis results in suggested sentences that are not reasonable. In fact, allowing the application of the loss enhancement to drive the sentence can undermine federal sentencing objectives, such as the need for proportionality in sentencing.[4] This is so in the instant case.

As with undue reliance on other guideline measures, such as drug quantity or child pornography enhancements, guidelines adjustments which are not based on empirical evidence can often result in guideline ranges that do not "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 51 U.S. 338 (2007); *Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013). It follows "that unless applied with great care," this guideline (like the child pornography guideline) can lead to unreasonable sentences that are inconsistent with what § 3553 requires. *See United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010). In practice, the significant, arbitrary increases in the monetary loss enhancement yield sentences far greater than the average sentences imposed and prison time actually served before the guidelines were adopted, a benchmark that Congress directed the Sentencing Commission to use as a "starting point." 28 U.S.C. § 994(m). This Court has observed that the fraud loss table is widely perceived to be "broken," that the loss table is not based on empirical data, and that the Sentencing Commission used a higher starting point than historical sentencing evidence dictated. *United States v. Corsey*, 723 F.3d 366, 378-79 (2d Cir. 2013) (Underhill, J., concurring).

**a. Current Guidelines Calculation in the PSR**

In Mr. Finkler's case, the PSR calculates the guidelines as follows:

---

[4] "Congress sought proportionality in sentencing though a system that imposes appropriately different sentences for criminal conduct of different severity." *Guidelines Manual*, Ch. 1, Pt. A, p. 3.

| | |
|---|---|
| 2B1.1(a) – Base Offense Level | 7 |
| 2B1.1(b)(1)(F) -- amount of loss (based on $165, 353.97) | +10 |
| 2B1.1(b)(2)(A)(i) – more than 10 victims | +2 |
| 2B1.1(b)(11)(C)(i) – breeding enhancement | +2 |
| 3E1.1 -- reduction for acceptance of responsibility | -3 |
| Total Offense Level | 18 |
| Guideline Range | 57-71 months |
| Plus Aggravated Identity Theft Counts (concurrent to each other) | 81-95 months or |
| Plus Aggravated Identify Theft Counts (consecutive) | 105-119 months |

A sentence of 9-10 years is simply not reasonable for the conduct in this case. It is too much.

**b. There is an alternative way to calculate the guidelines.**

In response to the fraud table's progressively increasing severity, other courts have referred instead to the original 1987 fraud guideline in making sentencing determinations. *See* Ex. B , *United States v. Watts*, 10-cr-000627(KAM) (E.D.N.Y. Apr. 24, 2014), Sentencing Tr. at 18:24-19:5; 45:18-20; (sentencing defendant within the 1987 guidelines range); Ex. C , *United States v. Hochfeld*, 13-cr-00021(PAC) (S.D.N.Y. Aug. 5, 2013), Sentencing Tr. at 20:4-9; 21:6-9 (using 1987 manual to calculate 30-37 month range in lieu of applying the "harsh result" using the current manual). Here, using the 1987 guidelines manual with the government's loss figure and without considering any grounds for downward departure, Mr. Finkler would face a guidelines range of 30-37 months instead of the 57-71 months range he faces today (not counting the consecutive time for the aggravated identity theft counts). Today's guidelines manual nearly doubles his exposure. The 1987 Guidelines calculations are set forth below.

**1987 Guidelines Manual Calculations**

| | |
|---|---|
| 2F1.1(a) -- Base Offense Level | 6 |
| 2F1.1(b)(1)(G) – Amount of Loss (based on $165353.97) | 6 |
| 2F1.1(b)(2)(B) – more than one victim | 2 |
| 3E1.1—reduction for acceptance of responsibility | -2 |
| Total Offense Level | 12 |
| Guideline Range | 30-37 |

| | |
|---|---|
| Aggravated Identity Theft (concurrent to each other) | 54-61 |
| Aggravated Identify Theft (consecutive) | 78-85 |

Unsurprisingly, given the circumstances around their adoption and amendments, the fraud guidelines are widely criticized for producing excessive sentences, largely due to the prominence loss is given when determining a sentencing range. Critics focus on the blind arithmetic calculations, which cause sentencing ranges driven principally by "numbers . . . drawn from nowhere." *See, e.g.*, Jed S. Rakoff, *Why The Federal Sentencing Guidelines Should Be Scrapped*, 26 Fed. Sent'g Rep 6, 6-9 (October 2013). In the case at bar, the range derived from the fraud loss table is inconsistent with the § 3553(a) factors and is accordingly unhelpful to the Court in crafting an appropriate sentence for Mr. Finkler. *See Rita*, 551 U.S. at 349-51. As one court explained,

> [T]he . . . Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense. By making a Guidelines sentence turn, for all practical purposes, on this single factor, the . . . Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face.

*United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).

Employing loss as the principal proxy for culpability in determining fraud sentences is a dubious proposition, if not contrary to the law, and indeed imposing a sentence on Mr. Finkler approaching the guidelines range calculated in the PSR would be "irrational" on its face and substantively unreasonable. Surely, his conduct deserves punishment, but not 9-10 years.

The Commission itself knows it has a problem and has been engaged in reviewing economic crimes, including "a comprehensive, multi-year study of Sec. 2B1.1 . . . and related guidelines, including an examination of the loss table and the definition of loss . . . ." 78 Fed. Reg. 51820-51821 (Aug. 21, 2013). That ongoing study has sought input from the bench and bar to determine what amendments to the loss table may be appropriate. Recognition of the need for reform follows from

the constant flow of sentencing decisions featuring what the Court confronts here -- the loss enhancement driving guidelines sentencing ranges for defendants above and beyond what is necessary.

**3. Sentencing Objectives of 18 U.S.C. § 3553(a).**

The goals of a federal criminal sentence, as articulated in the sentencing statute, 18 U.S.C. § 3553(a) are just punishment, incapacitation, deterrence and rehabilitation. All of these goals can be met without reliance on the high ranges of imprisonment set forth in the PSR.

**a. Sentencing Objectives and Disparity**

Congress requires sentencing courts to "consider the need for the sentence imposed to provide . . . just punishment" while simultaneously considering "need to avoid unwarranted sentence disparities among defendants with similar backgrounds who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(2) and (a)(6). Thus, a just punishment includes the concept that a just sentence is one that avoids the creation of unwarranted sentencing disparity. It is well-established that a guidelines sentence may create an unwarranted sentencing disparity, and here, imposition of a sentence within the Guidelines range, as the government advocates, would realize this very result. *United States v. De La Cruz*, 397 Fed. Appx. 676, 678-79 (2d Cir. 2010)(citing *Kimbrough*, 552 U.S. at 91). Statistics released by the Commission for fiscal year 2019 confirm the gross excessiveness of such a sentence while at the same time validating the defendant's argument for a below-guideline sentence. These statistics bear out that courts have accepted that the fraud guidelines are of limited utility.

For example, during the Commission's fiscal year 2019, only 48% of fraud sentences in the nation were within or above the Guidelines range. United States Sentencing Commission, *2019 Annual Report and 2019 Sourcebook of Federal Sentencing* Statistics, Table 31. The mean sentence length where fraud was the primary offense category was 21 months, while the median was 12 months.

*Id.* at Table 15.  A prison sentence in the ranges described in the PSR for Mr. Finkler would result in a lack of proportionality in sentencing and in disparate treatment for him in light of the sentences imposed in far more serious cases, involving exponentially greater losses.

The defense recognizes that each case and each defendant are different, and that it is often challenging to compare cases.  But, a consistent thread runs through the cases discussed below – the sentencing judges did not allow the loss table to dictate the sentencing decision.  For example, in this District in *United States v. Litvak*, 3:13cr19(JCH), the government maintained that "Jessie Litvak perpetrated a multi-year, multi-victim, multi-million dollar securities fraud scheme in the residential mortgage-backed securities ("RMBS") market.... During those 33 months, Litvak committed fraud on at least 76 occasions against 35 different victims. . . .  In each fraudulent transaction, Litvak caused his victim to suffer an actual loss . . . .  In total, this scheme netted Jeffries [Litvak's company] more than $6.3 million in fraudulent profits. . . ."  *United States v. Litvak*, 3:13-cr-19(JCH) (D.Conn. Oct. 23, 2014 , Gov't Sentencing Mem. at 3 [Doc. #648].  While the loss amount was disputed, Judge Hall found the loss to be in the "mid 4 million [dollar] range."  Ex. D, *United States v. Litvak,* 3:13-cr-19(JCH) (D.Conn. July23, 2014), Sentencing Tr. at 138:5-6.  Judge Hall did not reduce Mr. Litvak's offense level for acceptance of responsibility because she found that he had not admitted the elements of his offense.  *Id*.at 61.  His Guidelines range was 108-135 months.  *Id.*  Judge Hall found that the loss tables overwhelmed the other sentencing factors.  *Id*. at 142:11-17.  She sentenced Mr. Litvak to 24 months in jail.  His conviction was later overturned, but the remand had nothing to do with the sentence that was imposed.

The CEO of General Re Corp., Ronald Ferguson, was sentenced to 24 months' imprisonment by Judge Droney following Ferguson's conviction in connection with a scheme to falsely inflate AIG's reported loss reserves, a key indicator of financial health to insurance industry analysts and

investors. *United States v. Ferguson*, 3:06CR137(VLB).  The court attributed $544 million in losses to his offense conduct, which set the Guidelines range at life in prison.  The government requested "substantial" jail time.  The Second Circuit overturned Ferguson's conviction on appeal based on unfair prejudice resulting from the admission of certain evidence and due to a jury instruction that directed the verdict on causation.  The appellate decision did not address his sentencing.

Lestor and Lennox Parris were convicted of securities fraud for engaging in a "pump and dump" penny-stock scheme. *United States v. Parris*, 573 F. Supp. 2d 744, 746 (E.D.N.Y. 2008).  The Parris brothers gained nearly $5 million from the scheme and faced a guidelines range of 360 months to life in prison. *Id*. at 745, 748.  Rejecting the "piling on" and "'one-shoe-fits-all' approach" to enhancements under the guidelines, the court found that this sentence would be "draconian" and "unreasonable as a matter of law," and instead imposed a term of five years imprisonment. *Id*. at 745, 755.

Since 1987, the fraud guidelines have increased by 700 percent, principally due to political pressures put on Congress as opposed to the existence of any credible empirical evidence. *See*, *e.g.*, Frank O. Bowman III, Pour Encourager Les Autres?, 1 OHIO STATE J. CRIM. L. 373 (2004).  Loss has become a driving factor in the calculation of the fraud guidelines, and the emphasis on loss has come under scrutiny.  Illustrative of the lack of empirical evidence underlying the fraud guidelines, courts have observed that the "Sentencing Guidelines . . . in an effort to appear objective, tend to place great weight on putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, whoever, explaining why it is appropriate to accord such huge weight to such factors." *United States v. Adelson*, 441 F. Supp.2d 506 (S.D.N.Y. 2006), *aff'd*, 301 Fed. Appx. 93 (2d Cir. 2008).

An American Bar Association ("ABA") task force that included some judges in the Second Circuit as well as law school professors recently issued a report criticizing the fraud guidelines and proposing an alternative analysis. *See* ABA Report at http://lawprofessors.typepad.com/files/ussc-presentation-9-17-13.pdf. (September 20, 2013). The Report makes a number of suggested changes to the fraud guidelines, including lowering the enhancement levels for loss amount, as well as suggesting that a number of other specific offense considerations should be taken into account in calculating the guidelines. For example, the ABA Report suggests an enhancement of only six levels for a loss amount of more than $100,000 rather than the 10 levels that apply under the current Guidelines. The 10 levels applied to Mr. Finkler in the PSR are too much.

**Part IV – Bipolar Disorder**

**A. <u>There are other sentencing considerations that warrant a significant downward departure.</u>**

In addition to the unreliability of the fraud guidelines themselves, there are circumstances in this case that are "of a kind or to a degree not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553; USSG § 5K2.0. In particular, Mr. Finkler relies upon the following factor which justifies a downward departure: Mr. Finkler's mental and emotional condition which is present to an extraordinary degree and which greatly contributed to the conduct here. To the extent that the Court finds that this circumstance does not warrant a downward departure, his mental health also supports a downward variance and non-Guidelines sentence.

**1. Mental and Emotional Conditions**

Mr. Finkler's mental and emotional condition further distinguishes this case from a typical case covered by the Sentencing Guidelines and therefore provides a basis for granting a downward departure and/or variance. Pursuant to U.S.S.G. § 5H1.3, "mental and emotional conditions may be

relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." Mr. Finkler has been diagnosed with bipolar disorder type II. It is essential that Mr. Finkler's mental health diagnosis be considered in fashioning the sentence. This is true both as necessary to understanding its relationship to his criminal behavior as well as for planning how best to supervise him once he is released.

While this may be an atypical approach, counsel has gathered a number of studies, summarized below, to demonstrate that bipolar disorder does relate to risk taking and criminal behavior and, most importantly, it can be managed. Mr. Finkler's mental health condition certainly played a role in his criminal conduct in this and in other cases. He has not been adequately treated for the condition. If we are ever to break the cycle that Mr. Finkler has engaged in of repeatedly committing fraud offenses and failing on supervision, it is necessary to focus on treating his bipolar disorder, which is certainly an achievable goal. Bipolar disorder, as the studies below indicate, is manageable. The studies are set forth in some detail so as to provide the Court with some ideas for how Mr. Finkler might be managed on supervision in the future.

**a. What is bipolar disorder Type II?**

Bipolar disorder Type II is a mental disorder defined by "unusual shifts in mood, energy, activity levels, concentration, and the ability to carry out day-to-day tasks."[5] While commonly thought to be a less severe form of bipolar I disorder, bipolar II disorder is an equally disabling

---

[5] National Institute of Mental Health (2013). *Bipolar Disorder*. Retrieved November 13th, 2020, from https://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml

condition that features a greater prevalence of depressive episodes.[6]  A diagnosis of bipolar II disorder requires one or more episodes of depression and hypomania, and the absence of the severe or prolonged manic episodes characteristic of bipolar 1 disorder.[7]  Although patients with bipolar II disorder do not suffer from full-blown mania, the less severe form of mood elevation characteristic of hypomania can turn into severe mania or depression if left untreated.[8]  During depressive episodes, patients with bipolar II may suffer from lethargy, sleeping problems, lack of motivation, concentration issues, extreme sadness, and thoughts of suicide.[9]  Mr. Finkler's previously documented diagnosis of attention deficit hyperactivity disorder (PSR, ¶ 80) may also exacerbate the symptoms of his bipolar disorder, as research has shown evidence of decreased quality of life for patients suffering from both conditions.  As the research summarized below reveals, patients with both forms of bipolar disorder additionally have higher rates of trait-like impulsivity[10] and may have a greater tolerance for risk.[11]

The well-established link to impulsivity discussed in the literature may contribute to the disproportionate levels of incarceration of people with bipolar disorder.  Multiple of the studies summarized below demonstrate that bipolar disorder is associated with increased rates of incarceration and, in particular, increased rates of repeat incarceration.[12]  Patients with bipolar

---

[6] Yatham, Lakshmi N et al. "Canadian Network for Mood and Anxiety Treatments (CANMAT) and International Society for Bipolar Disorders (ISBD) 2018 guidelines for the management of patients with bipolar disorder." *Bipolar Disorders* vol. 20,2 (2018): 97-170. doi:10.1111/bdi.12609

[7] Yatham, "CANMAT and ISBD 2018 Guidelines," 1.

[8] National Institute of Mental Health, "Bipolar Disorder."

[9] National Institute of Mental Health, "Bipolar Disorder."

[10] Swann, Alan C et al. "Increased trait-like impulsivity and course of illness in bipolar disorder." *Bipolar Disorders* vol. 11,3 (2009): 280-8. doi:10.1111/j.1399-5618.2009.00678.x

[11] Chandler, Rebecca A et al. "Altered risk-aversion and risk-seeking behavior in bipolar disorder." *Biological Psychiatry* vol. 66,9 (2009): 840-6. doi:10.1016/j.biopsych.2009.05.011

[12] Baillargeon, Jacques, et al. "Psychiatric Disorders and Repeat Incarcerations: The Revolving Prison Door." *American Journal of Psychiatry*, vol. 166, no. 1, Jan. 2009, pp. 103–09, doi:10.1176/appi.ajp.2008.0803041

disorder that have been incarcerated were likely to be experiencing some form of mania at the time of their arrest, and both impulsivity and heightened risk-taking behaviors are factors in the diagnosis that may increase the likelihood that a person with bipolar disorder commits a crime.[13]  Mr. Finkler's social history included moderate substance abuse issues (PSR ¶ 79), and substance abuse is correlated with both higher rates of arrest and increased impulsivity among bipolar patients.[14]

Robust treatment options exist for bipolar II disorder, although there are significant gaps in research specifically targeted to patients with bipolar II.  Recommended courses of treatment include both psychopharmacology and psychosocial interventions, both of which are described in further detail in the "Courses of Treatment" section below.

**b.  The Impacts of Bipolar Disorder on Behavior**

**1.  "Increased Trait-like Impulsivity and Course of Illness in Bipolar Disorder"**

Swann, Alan C et al. "Increased trait-like impulsivity and course of illness in bipolar disorder." *Bipolar Disorders* vol. 11,3 (2009): 280-8. doi:10.1111/j.1399-5618.2009.00678.x

This study demonstrated that subjects with bipolar disorder have higher levels of trait-like impulsivity than nonbipolar comparison subjects as measured by the Barratt Impulsiveness Scale.[15] Citing past research, the authors noted that potential consequences of increased levels of impulsivity include substance abuse (Swann et al, 2004), suicidal behavior (Simon et al, 2001), and other serious behavioral problems (Stanford and Barrett, 1992).  In this study, "increased impulsivity was most

---

[13] Quanbeck, Cameron D et al. "Clinical and legal correlates of inmates with bipolar disorder at time of criminal arrest." *The Journal of Clinical Psychiatry,* vol. 65,2 (2004): 198-203. doi:10.4088/jcp.v65n0209
[14] Swann, Alan C et al. "Increased trait-like impulsivity and course of illness in bipolar disorder." *Bipolar Disorders* vol. 11,3 (2009): 280-8. doi:10.1111/j.1399-5618.2009.00678.x
[15] Swann, Alan C et al. "Increased trait-like impulsivity and course of illness in bipolar disorder." *Bipolar Disorders* vol. 11,3 (2009): 280-8. doi:10.1111/j.1399-5618.2009.00678.x

pronounced in patients with a severely unstable course of illness, reflected by more frequent episodes, early age of onset, and histories of substance use disorders and suicide attempts."[16]

However, bipolar subjects with no history of any of these exacerbating characteristics still had higher rates of impulsivity than the nonbipolar comparison group.[17]

**2. "Impulsivity and Risk Taking in Bipolar Disorder and Schizophrenia"**

Reddy, L., Lee, J., Davis, M. *et al.* "Impulsivity and Risk Taking in Bipolar Disorder and Schizophrenia." *Neuropsychopharmacology* 39**,** 456–463 (2014). https://doi.org/10.1038/npp.2013.218

This study evaluated three groups of participants: subjects with bipolar disorder, subjects with schizophrenia, and a control group of subjects without either disorder. Citing previous research, the authors of this study define impulsivity as "… a predisposition toward unplanned reactions without consideration of consequences" (Moeller et al, 2001) that "…can include risky decision making, self-reported high-risk attitudes, poor response inhibition, and rapid decision making" (Courtney et al, 2012).[18] In concurrence with previous findings, researchers in this study found that subjects in the bipolar group had elevated levels of self-reported impulsivity, regardless of a diagnosis of bipolar I or bipolar II disorder.[19] However, in a task designed to measure risk-taking behaviors, bipolar patients performed comparably to the control group.[20] While previous evidence has been mixed, researchers in this study found that the bipolar subjects taking antipsychotic (AP) medications were both less impulsive and more risk-averse than bipolar patients who were not taking these

---

[16] Swann et al, "Increased Trait-like Impulsivity," 8.
[17] Swann et al, "Increased Trait-like Impulsivity," 6.
[18] Reddy, L., Lee, J., Davis, M. *et al.* "Impulsivity and Risk Taking in Bipolar Disorder and Schizophrenia." *Neuropsychopharmacology* 39**,** 456–463 (2014). https://doi.org/10.1038/npp.2013.218
[19] Reddy, "Impulsivity and Risk Taking in Bipolar Disorder," 456.
[20] Reddy, "Impulsivity and Risk Taking in Bipolar Disorder," 456.

medications.[21]  These findings might explain inconsistencies in past studies on risk taking in bipolar disorder because they may have included varying proportions of bipolar subjects on AP medications. Additionally, these results indicate that reduced impulsivity is a potential benefit of AP medications for some patients.[22]

### 3. Attention-Deficit/Hyperactivity Disorder in Adults With Bipolar Disorder or Major Depressive Disorder: Results From the International Mood Disorders Collaborative Project

McIntyre, Roger S et al.  "Attention-deficit/hyperactivity disorder in adults with bipolar disorder or major depressive disorder: results from the international mood disorders collaborative project."  *Primary care companion to the Journal of clinical psychiatry* vol. 12,3 (2010): PCC.09m00861. doi:10.4088/PCC.09m00861gry

This study evaluated 399 participants in the International Mood Disorders Collaborative Project for symptoms of Attention-deficit/Hyperactivity Disorder (ADHD).  Researchers found that patients with both bipolar disorder and ADHD had significantly higher rates of psychiatric comorbidities (including anxiety and panic disorders), lower work productivity scores, greater frequency of violence and legal problems, and an overall decreased quality of life.[23]  Additionally, patients with these conditions were more likely to be currently unemployed or receiving disability and more likely to have issues with chronic substance abuse.[24]  In a discussion of treatment options,

---

[21] Reddy, "Impulsivity and Risk Taking in Bipolar Disorder," 461.

[22] Reddy, "Impulsivity and Risk Taking in Bipolar Disorder," 461.

[23] McIntyre, Roger S et al. "Attention-deficit/hyperactivity disorder in adults with bipolar disorder or major depressive disorder: results from the international mood disorders collaborative project." *Primary Care Companion to the Journal of Clinical Psychiatry* vol. 12,3 (2010): PCC.09m00861. doi:10.4088/PCC.09m00861gry

[24] McIntyre, "Attention-deficit/hyperactivity disorder in adults with bipolar disorder," 1.

the authors also note that psychostimulants, used as a conventional first-line treatment for ADHD, may pose a risk of destabilization to patients with bipolar disorder.[25]

**C. Bipolar Disorder and Criminality**

**1. "Psychiatric Disorders and Repeat Incarcerations: The Revolving Prison Door."**

Baillargeon, Jacques, et al. "Psychiatric Disorders and Repeat Incarcerations: The Revolving Prison Door." *American Journal of Psychiatry*, vol. 166, no. 1, Jan. 2009, pp. 103–09, doi:10.1176/appi.ajp.2008.0803041

The population of the study included 79,211 inmates in Texas, all of whom began serving sentences between 2006 and 2007 in the state prison system.[26] Using data on psychiatric disorders, demographic characteristics, and incarceration history from statewide medical information systems, this study concluded that prison inmates with major psychiatric disorders had higher rates of recidivism than those who did not.[27] Notably, "The greatest increase in risk was observed among inmates with bipolar disorders, who were 3.3 times more likely to have had four or more previous incarcerations compared with inmates who had no major psychiatric disorder."[28] The study also found that patients with bipolar disorder had a higher proportion of assault and property offense charges when compared with inmates who had no psychiatric disorder.[29]

In a series of recommendations to reduce the incarceration of the mentally ill, the authors rely substantially on previous research. In particular, the authors point to the potential efficacy of the

---

[25] McIntyre, "Attention-deficit/hyperactivity disorder in adults with bipolar disorder," 1.

[26] Baillargeon, Jacques, et al. "Psychiatric Disorders and Repeat Incarcerations: The Revolving Prison Door." *American Journal of Psychiatry*, vol. 166, no. 1, Jan. 2009, pp. 103–09, doi:10.1176/appi.ajp.2008.0803041

[27] Baillargeon, "Psychiatric Disorders and Repeat Incarcerations," 103.

[28] Baillargeon, "Psychiatric Disorders and Repeat Incarcerations," 103.

[29] Baillargeon, "Psychiatric Disorders and Repeat Incarcerations," 105.

diversion model, which "…draws on a wide range of strategies to divert persons with severe mental illness to appropriate community-based mental health services in lieu of incarceration."[30] These interventions can occur both pre-arrest, through law enforcement partnerships with mental health professionals (Steadman, et. al. 1995) (Lamb and Weinberger, 2002), and post-booking through diversion to mental health courts or other treatment programs.[31] Additionally, the authors suggest that continuity of care programs for released inmates are crucial, citing a study that demonstrates that patients with bipolar disorder face higher rates of recidivism when they have inadequate access to hospitalization and untreated co-morbid substance use post-release (Quanbeck et al, 2005).[32]

**2. Criminal Conviction, Impulsivity, and Course of Illness in Bipolar Disorder**

Swann, Alan C et al. "Criminal conviction, impulsivity, and course of illness in bipolar disorder." *Bipolar Disorders* vol. 13,2 (2011): 173-81. doi:10.1111/j.1399-5618.2011.00900.x

This study, which recruited 112 individuals from the community with bipolar disorder, concluded that the 39 subjects with criminal histories were more likely than the other study participants to display symptoms of antisocial personality disorder and illness with a "more recurrent course with a propensity toward mania."[33] The subjects with criminal histories also had "increased impulsivity as reflected by response inhibition," although those who had committed violent crimes were not measurably more impulsive than those with nonviolent offenses.[34]

---

30 Baillargeon, "Psychiatric Disorders and Repeat Incarcerations," 107.
31 Baillargeon, "Psychiatric Disorders and Repeat Incarcerations," 108.
32 Baillargeon, "Psychiatric Disorders and Repeat Incarcerations," 108.
33 Swann, Alan C et al. "Criminal conviction, impulsivity, and course of illness in bipolar disorder." *Bipolar Disorders* vol. 13,2 (2011): 173-81. doi:10.1111/j.1399-5618.2011.00900.x
34 Swann, Criminal Conviction, Impulsivity, and Course of Illness in Bipolar Disorder," 1.

**D. Courses of Treatment**

**1. "Canadian Network for Mood and Anxiety Treatments and International Society for Bipolar Disorders 2018 Guidelines for the Management of Patients with Bipolar Disorder"**

Yatham, Lakshmi N et al. "Canadian Network for Mood and Anxiety Treatments (CANMAT) and International Society for Bipolar Disorders (ISBD) 2018 guidelines for the management of patients with bipolar disorder." *Bipolar Disorders* vol. 20,2 (2018): 97-170. doi:10.1111/bdi.12609

This publication outlines treatment guidelines through the synthesis of major research on a variety of safe and effective interventions for bipolar disorder. Section 6 outlines guidelines and diagnostic criteria specifically for bipolar II (BDII), which is defined by "…one or more episodes of hypomania, one or more episodes of depression, and an absence of manic episodes."[35] Hypomania is similar to mania, "…with symptoms being uncharacteristic of the individual, observable by others, and lasting at least 4 consecutive days."[36] However, hypomania is definitionally less severe than mania and does not cause marked impairment, require hospitalization, or include psychosis.[37]

In their discussion of bipolar II disorder, the authors make clear that the widespread belief that bipolar II is a less severe form of bipolar I disorder is a misconception. Citing previous research, the authors establish the bipolar II is an equally disabling condition, with an economic burden up to four times greater than bipolar 1 (Dilsaver, 2009), likely due to more time spent in the depressive phase (Judd et al, 2003).[38] While there is a lack of high-quality research specifically tailored to bipolar II, the authors note that most studies find that responses to mood stabilizers and antipsychotics are similar

---

[35] Yatham, Lakshmi N et al. "Canadian Network for Mood and Anxiety Treatments (CANMAT) and International Society for Bipolar Disorders (ISBD) 2018 guidelines for the management of patients with bipolar disorder." *Bipolar Disorders* vol. 20,2 (2018): 97-170. doi:10.1111/bdi.12609

[36] Yatham, "CANMAT and ISBD 2018 Guidelines," Section 6.1.

[37] Yatham, "CANMAT and ISBD 2018 Guidelines," Section 6.1.

[38] Yatham, "CANMAT and ISBD 2018 Guidelines," Section 6.1.

between bipolar 1 and bipolar 2 disorders, with some alterations necessary in the diagnostic criteria.[39] Medications for acute management of hypomania are necessary when hypomania is impairing, and "clinicians should consider mood stabilizers such as lithium or divalproex and/or atypical antipsychotics" when prescribing treatment.[40] For management of bipolar II depression, Quetiapine (an antipsychotic) is the only recommended first line treatment and second line treatments include both lithium and several varieties of antidepressants.[41]

In addition to pharmacotherapy, psychosocial interventions are cited by the authors as useful in treating acute depressive episodes and increasing quality of life.[42] The authors write, "Positive evidence has been found for psychoeducation, cognitive behavioral therapy (CBT), family-focused therapy (FFT), interpersonal and social-rhythm therapy (IPSRT), and peer support in the maintenance phase of BD and these interventions are included as recommended adjunctive treatment options."[43]

**2. "Psychotherapy for Bipolar Disorder in Adults: A Review of the Evidence"**

Swartz, Holly A, and Joshua Swanson. "Psychotherapy for Bipolar Disorder in Adults: A Review of the Evidence." *Focus (American Psychiatric Publishing)* vol. 12,3 (2014): 251-266. doi:10.1176/appi.focus.12.3.251

This literature review establishes the efficacy of psychotherapy in the treatment of bipolar disorder. In a review of the results from 28 randomized controlled studies testing psychosocial interventions for bipolar disorder, the authors determined that the addition of psychotherapy to

---

[39] Yatham, "CANMAT and ISBD 2018 Guidelines," Section 6.2.1.
[40] Yatham, "CANMAT and ISBD 2018 Guidelines," Section 6.2.2
[41] Yatham, "CANMAT and ISBD 2018 Guidelines," Section 6.2.3
[42] Yatham, "CANMAT and ISBD 2018 Guidelines," Section 2.6
[43] Yatham, "CANMAT and ISBD 2018 Guidelines," Section 2.6

pharmacotherapy was associated with improved outcomes for bipolar patients.[44] While studies reviewed in the paper establish that active treatment programs are consistently better than treatment as usual (TAU), "…most RCTs [randomized controlled trials] that compare two evidence-based psychotherapies show little difference between them, suggesting that any of the bipolar disorder-specific psychotherapies will help."[45]

The psychotherapies reviewed in the studies included individual psychoeducation, group psychoeducation, individual cognitive-behavioral therapy, group cognitive-behavioral therapy, family therapy, interpersonal and social rhythm therapy, and integrated care management.[46] These treatments consistently demonstrated improvements in outcomes as defined by symptom burden and risk of relapse.[47]

**PART V – The Appropriate Sentence**

There are lots of sentencing options here. The Court must impose a sentence on the Wire Fraud counts, and it must impose a consecutive sentence two year sentence on at least one of the Aggravated Identity Theft counts. The sentences on the Aggravated Identify theft counts, however, may run concurrent to each other. So what is the right thing to do?

As noted earlier, the Sentencing Commission collects data on fraud sentences, and the mean sentence imposed in 2019 is 21 months. Defendant is not suggesting that that is the right sentence here by any stretch, but offers the data to show that sentencing courts do not typically impose

---

[44] Swartz, Holly A, and Joshua Swanson. "Psychotherapy for Bipolar Disorder in Adults: A Review of the Evidence." *Focus (American Psychiatric Publishing)* vol. 12,3 (2014): 251-266. doi:10.1176/appi.focus.12.3.251

[45] Swartz, "Psychotherapy for Bipolar Disorder," 13.

[46] Swartz, "Psychotherapy for Bipolar Disorder," 1.

[47] Swartz, "Psychotherapy for Bipolar Disorder," 1.

guideline sentences in fraud cases, for the reasons previously explained in the discussion of the broken fraud guidelines.

It is also important to point out that the Sentencing Commission studied the mandatory minimum penalties for identity theft crimes. *See* United States Sentencing Commission, *Mandatory Minimum Penalties for Identity Theft Offenses in the Federal Criminal Justice System* (September 2018). A key finding of that study was "For those offenders convicted of multiple counts under section 1028A, the court exercised its discretion to impose sentences for additional 1028A counts concurrently in the overwhelming majority of cases (89.6%). *Id.* at 6.

Mr. Finkler has clearly earned a jail sentence. No one disputes that fact. He has repeatedly committed fraud offenses, and his conduct here was brazen. He is, however, a person with mental health issues that contribute to his criminality and risk taking behavior. The trick here is to find a way to manage his mental health issues so that he does not re-offend. That goal is frankly more important, at least for the future public's safety, than the amount of time he actually serves. That is, if he emerges from jail and begins supervised release no better able to control impulses, then we will have accomplished little.

Mr. Finkler is an aging offender with a serious mental health diagnosis. The goals of a criminal sentence can be met with a below-Guidelines term of incarceration followed by a rigorously monitored period of supervised release where regular mental health treatment – and compliance with treatment – are essential requirements.

Attached to this memorandum as Exhibit A are letters from Mr. Finkler and officials at the Donald W. Wyatt Detention Center (the latter verifying Mr. Finkler's good conduct and hard work at the institution).

Respectfully Submitted,

THE DEFENDANT,
Steven Finkler

FEDERAL DEFENDER OFFICE

Date: February 08, 2021

*/s/ Terence Ward*
Federal Defender
10 Columbus Blvd, 6th FL
Hartford, CT 06106
Phone: (860) 493-6260
Bar No.: ct00023
Email: terence_ward@fd.org

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 08, 2021, a copy of the foregoing Defendant's memorandum in aid of sentencing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Terence Ward*
Terence Ward