UNITED STATES OF AMERICA

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.  3:19-CR-00199 (SRU) |
| | : | |
| v. | : | |
| | : | |
| STEVEN FINKLER | : | February 12, 2021 |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The government respectfully submits this memorandum in aid of sentencing for the sentencing hearing of the defendant Steven Finkler, scheduled for February 17, 2021.  For the reasons provided below, this Court should depart upward from the Guidelines range and sentence the defendant to 120 months' incarceration, an 8-year term of supervised release, and restitution in the amount of $145,657.06.[1]

### I.    INTRODUCTION

When this Court sentenced Steven Finkler in December 2013 for his fifth federal fraud conviction, it told him:  "I wish we had far fewer prisons than we have, but I'm convinced that if we have prisons you're somebody who should be in one, because you have an unbroken record of fraud and hurt and harm everywhere you've ever gone."  *See* Exhibit A at 48.  Seven years later, Finkler stands before this Court yet again, this time on his *sixth* federal conviction, for victimizing a Wallingford couple that owns a small business and numerous individuals around the state who believed they had secured their wallets in lockers at their local gyms.

---

[1] This restitution figure is $25.02 lower than the number set forth in the plea agreement because of a calculation error.  The correct restitution amount is $145,657.06.

Finkler is an incorrigible fraudster whose criminal behavior has continued unabated since 1982, except when interrupted by various periods of incarceration.  Even incarceration did not stop him this time, though, as he stole the identity of a fellow inmate and used it to perpetrate his gym-related fraud merely days after he was released.  Finkler's longest sentence of 92 months' imprisonment clearly was not long enough.  The Government repeats here what it argued in 2013:  Finkler "is a recidivist of the worst order who needs to be incarcerated for as long as possible in order to punish him, to send a message of general deterrence, and to protect the public."  *See United States v. Finkler*, No. 3:13-CR-79 (SRU), Docket #16.  Although upward departures from the Guidelines range are somewhat rare, Finkler merits an exceptional sentence.

## II.    FACTUAL BACKGROUND

The Superseding Indictment in the instant case against Finkler charged two sets of federal fraud crimes:  (1) crimes relating to the victimization of a Wallingford couple who owns a small business (Counts One and Two); and (2) crimes relating to the stealing of credit cards from gym lockers around the state (Counts Three through Ten).

Counts One and Two

In August of 2017, Finkler was working as a salesperson for Wurth USA, a company that sold auto parts to businesses.  Presentence Report ("PSR") ¶ 6.  One of his customers was an auto parts store in Wallingford, Connecticut, that was owned by victims T.R. and H.R., a married couple.  PSR ¶ 6.

On September 6, 2017, the victims filed a complaint with the Wallingford Police Department regarding several fraudulent charges that had appeared on four credit cards held in their names and their business's name.  PSR ¶ 7.  The complaint was triggered by a call to H.R. on August 28, 2017, from the fraud detection unit at the Discover credit card company.  PSR ¶ 7.

Discover was attempting to verify that H.R. was using her card at a Walgreens store; she was not.  PSR ¶ 7.  When H.R. checked her wallet, she realized the Discover card was missing.  PSR ¶ 7.  The balance on that card, which should have been approximately $3,200, was more than $9,000.  PSR ¶ 7.  Two of her other credit cards were present in her wallet but bore signatures on the back that neither H.R. nor her husband, T.R., recognized.  PSR ¶ 7.  One of those cards had fraudulent charges totaling more than $10,000, including charges at retail stores like Apple and Kate Spade.  PSR ¶ 7.  Another card included a charge for a $2,800 ring purchased at a New York jewelry store.  PSR ¶ 8.  In total, H.R.'s and T.R.'s credit cards were fraudulently charged $20,867.73.  PSR ¶ 9.  A full listing of the charges appears in the PSR at paragraph 9.

These fraudulent purchases were linked to Steven Finkler through various methods, including phone numbers associated with purchases, surveillance videos, and the use of membership accounts for the purchases by individuals associated with Finkler.  PSR ¶¶ 10-13.  Wurth USA's records confirmed that Finkler had visited H.R.'s and T.R.'s business in August of 2017, when he had likely stolen (and in some cases) replaced the credit cards.  PSR ¶ 14.  When Finkler visited their business, the victims had given him access to the stock room, where H.R. kept her purse, in order for him to check inventory.  PSR ¶ 14.

On September 3, 2017, in connection with attempting to execute a federal arrest warrant for Finkler for a previous violation of supervised release, Madison Police Department officers found Finkler hiding in the attic of Finkler's then-girlfriend's house.  PSR ¶ 13.  Finkler was not arrested for the Wallingford fraud at that time.  Later, as part of the instant investigation, the girlfriend surrendered to agents a Cartier 18-karat ring, purchased by Finkler on the Wallingford victims' credit card for $2,878.56.  That ring has been forfeited pursuant to the Court's Order dated October 20, 2020.  *See* Docket #53.

Counts Three through Ten

On April 17, 2018, Finkler was sentenced to 14 months' imprisonment following a violation of his supervised release term in Case Number 3:13cr79 (SRU).  PSR ¶ 16.  According to records from the Bureau of Prisons, he entered BOP custody one week later and transited through Brooklyn and Philadelphia before serving the remainder of his sentence at Otisville FCI.  PSR ¶ 16.  While he was at the Brooklyn Metropolitan Detention Center for approximately one week, he met fellow inmate G.T., who was serving a 24-month sentence for bank fraud and money laundering.  PSR ¶ 16.  According to G.T., Finkler told G.T. that Finkler was an attorney who could assist G.T. with the inevitable credit problems that would face G.T. after he was released from prison.  PSR ¶ 17.  Believing Finkler's lies, G.T. provided Finkler with his personal identifying information, including G.T.'s date of birth.  PSR ¶ 17.  G.T. eventually decided that Finkler was untrustworthy and stopped communicating with him.  PSR ¶ 17.

Finkler was released from BOP custody on September 7, 2018.  PSR ¶ 18.  Eleven days later, he opened a PayPal account under the business name "JS[2] Ventures" using his real name, an email address containing his name, and a phone number subscribed to him.  PSR ¶ 18.  Finkler also later created accounts under the business names "GT Limited" and "GT Limited LLC" with two credit card scanning device companies, Squared-Up and Clover/First Data Services.  For the Squared-Up account application, Finkler used G.T.'s name, date of birth, and Social Security number with the last four digits in partial reverse order (i.e., "3412" instead of "1234").  PSR ¶ 18.  For the Clover/First Data application, Finkler used G.T.'s name and Social Security number in the same partial reverse order.  Both applications used a mailing address that

---

[2] "JS" are the initials of the girlfriend of Finkler's who surrendered the Cartier ring to investigators.

Finkler had provided as his own address in connection with his release on bond in various state cases.  PSR ¶ 18.

On January 23, 2019, a victim with the initials W.M. complained to the Avon, Connecticut Police Department that after working out in the Healthtrax gym in Avon, he received an email from Square, the company associated with Squared-Up, stating that his Navy Federal Credit Union credit card had been charged $1,555.00 by "GT Limited."  PSR ¶ 19. W.M.'s credit card was not missing from his wallet, which he had left in a locker in the men's locker room at Healthtrax while he exercised.  PSR ¶ 19.  Avon Police obtained a search warrant for Squared-Up's records, which provided the account application information noted above for GT Limited and also demonstrated that the GT Limited account had been linked to a Torrington Municipal and Teachers Federal Credit Union account in Finkler's name.  PSR ¶ 19.  The credit union in turn provided, among other documents, a copy of Finkler's driver's license, which he submitted in connection with opening the bank account.  PSR ¶ 19.

In addition to Avon, police departments around the state, including in Glastonbury, Guilford, North Haven, and Branford took similar complaints between January and May 2019 about credit cards being charged while their owners were exercising in health clubs, typically Healthtrax gyms.  PSR ¶ 20.  In Glastonbury, a gym patron reported that his locker lock was missing and a small piece of it, which appeared to have been snipped, was on the floor area near the locker.  PSR ¶ 20.  Shortly thereafter, the victim noticed that he had a fraudulent charge from "JS Ventures" for $2,395 on one of his credit cards.  PSR ¶ 20.  An off-duty East Hartford Police Department officer also observed Finkler at the Glastonbury Healthtrax location on a different occasion threading a towel through the top portion of a lock on a locker and then pulling the towel ends downward as if attempting to force the lock open.  PSR ¶ 20.  In most instances,

Finkler would replace the credit card of the victim after assessing a charge against it with a mobile card scanning device; this delayed the victims' realization that their cards had been compromised.  PSR ¶ 20.

Healthtrax facilities identified member "G.T." as the possible suspect in these crimes. PSR ¶ 21.  On May 14, 2019, "G.T." entered the North Haven gym location and began to act suspicious, pacing around the men's locker room area.  PSR ¶ 21.  The manager, who had been alerted to call the police if "G.T." entered the facility, did call the police.  PSR ¶ 21.

When police arrived and went into the locker room, the man quickly entered a bathroom stall.  PSR ¶ 22.  Officers heard the sounds of something being manipulated within the stall and paper shuffling.  PSR ¶ 22.  The man eventually opened the stall door and identified himself as Steven Finkler.  PSR ¶ 22.  When Finkler said that his identification was in his car, the officers escorted him there.  PSR ¶ 22.  Upon searching the bathroom stall, they found a Clover brand credit card scanning device in the toilet seat cover holder.  PSR ¶ 22.

At the time, Finkler had an outstanding arrest warrant from Branford.  He was arrested on that warrant and searched incident to his arrest.  PSR ¶ 23.  Officers found a Healthrax membership card in the name of G.T. and an iPhone on his person.  PSR ¶ 23.  Finkler claimed to have found the G.T. Healthtrax card on the ground.  PSR ¶ 23.

The iPhone seized from Finkler, which has been forfeited, *See* Docket #53, contained search history for various Healthtrax locations (including two where victims' cards were charged) and for the Clover "dashboard" site for GT Limited LLC, among other relevant items. PSR ¶ 24.  The phone also had applications installed for Clover, PayPal, and Square.  PSR ¶ 24.

In total, Finkler charged or attempted to charge 31 victims' credit cards in amounts ranging from approximately $1,000 to $4,475 as part of the gym-related fraud.  PSR ¶ 25.  At

least 13 of these victims were over the age of 65.  PSR ¶ 25.  The Government believes that

Finkler may have target times of the day when seniors use the gym.  PSR ¶ 25.  The actual loss

associated with the gym-related charges was $64,915.33.  PSR ¶ 24.  Finkler also attempted an

additional $16,671.89 in charges that were rejected by the credit card companies.  PSR ¶ 25.  In

addition, the investigation revealed that Finkler charged an additional $59,874.00 to 19 other

victims using a Clover/First Data scanning device between February 6, 2019, and May 17, 2019.

PSR ¶ 25.

The total loss (including attempted loss) attributable to Finkler's conduct in the 2017

credit card theft scheme and the 2019 gym-related fraud scheme is $165,353.97.  PSR ¶ 27.  The

actual loss caused by Finkler's crimes is $145,682.08.  PSR ¶ 27.  Based on a review of Finkler's

records, it appears that Finkler spent the money on personal expenses.  PSR ¶ 27.

In August of 2019, after Finkler was indicted for the above-described fraud schemes,

investigators received a report of credit card fraud from the company that was then Finkler's

employer.  According to a representative of that company, Finkler had presented the false name

of Andrew Finkler when he applied for employment with the company in June of 2019, so the

company was unaware of his criminal history.  The company discovered that fraudulent charges

were made on two of its credit cards at an Apple retail store in Trumbull, Connecticut, in June

and July of 2019.  The fraudulent charges totaled $3,135.20.  Because the Apple store was not

able to provide video of the fraudulent transactions, no one was charged in connection with these

incidents.  The Government nonetheless provides the information to the Court because the

company suspected Finkler was responsible for the fraudulent charges.[3]

---

[3] It is notable that several of the fraudulent purchases conducted by Finkler against the
Wallingford couple's credit cards included Apple Store purchases.  *See* PSR ¶ 9.

### III.     **PROCEDURAL HISTORY**

Finkler initially was charged by way of indictment on August 8, 2019.  He was arrested on August 15, 2019, was ordered detained, and has been in custody since.  The Government sought and obtained a superseding indictment on October 3, 2019, due to an error in charging language in the original indictment.  *See* Docket #18.  Pursuant to a written plea agreement ,Finkler pleaded guilty to Counts One, Two, Three, and Seven of the Superseding Indictment, charging violations of 18 U.S.C. §§ 1029(a)(5), 1343, and 1028A, on January 15, 2020.  *See* Docket #28.  His sentencing hearing was delayed several times due to COVID-19 issues.

### IV.     **THE GUIDELINES CALCULATION**

The parties and the United States Probation Office agree on the Guidelines calculation, given that the Government is no longer pursuing one particular enhancement, for reasons described below.  The parties and the PSR agree that, for Counts One and Three, which are grouped, the following Guidelines apply:

| | | |
|---|---|---|
| Base Offense Level: | 7 | (U.S.S.G. § 2B1.1(a)(1) |
| Loss Between $150,000 and $250,000: | +10 | (U.S.S.G. § 2B1.1(b)(1)(F)) |
| More than 10 Victims: | +2 | (U.S.S.G. § 2B1.1(b)(2)(A)(i) |
| | | |
| Total: | 19 | |

In the plea agreement, Finkler had reserved his right to challenge the Government's position that an additional two-level enhancement for unauthorized use of a means of identification to unlawfully obtain another means of identification should also apply.  *See* U.S.S.G. § 2B1.1(b)(11)(C)(i); Docket #28 at 6.  Upon further review, the Government concedes that the § 2B1.1(b)(11)(C)(i) enhancement does not apply because of Application Note 2 to U.S.S.G. § 2B1.6, which addresses aggravated identity theft convictions under Section 1028A. Section 2B1.6(a) provides:  "If the defendant was convicted of violating 18 U.S.C. § 1028A, the

guideline sentence is the term of imprisonment required by statute," which is two years.  Section

2B1.6, Application Note 2, states:

> If a sentence under this guideline [2B1.6] is imposed in conjunction with a sentence for an underlying offense, **do not apply any specific offense characteristic for the transfer, possession, or use of a means of identification when determining the sentence for the underlying offense**.  A sentence under this guideline accounts for this factor for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).

(Emphasis added.)  Here, because Finkler pleaded guilty to two counts of 18 U.S.C.

§ 1028A (Counts 2 and 7), a sentence under Section 2B1.6 will be imposed "in conjunction with

a sentence for an underlying offense," (here, the access device fraud and wire fraud offenses

charged in Counts 1 and 3).  Thus, under Application Note 2, no enhancements for transfer,

possession, or use of a means of identification—including, by the Government's reading, use of

a means of identification to obtain another means of identification under § 2B1.1(b)(11)(C)(i)—

should be applied "when determining the sentence for the underlying offense."  For that reason,

the Government withdraws its argument from the plea agreement that two levels are added under

§ 2B1.1(b)(11)(C)(i) for the Guidelines calculation for Counts One and Three.

Thus, the total offense level is 19, from which three levels are subtracted for acceptance

of responsibility.  The parties and the PSR agree that Finkler is in Criminal History Category VI.

The recitation of Finkler's criminal history—consisting of at least 16 past arrests—takes up

almost ten full pages of the PSR.  *See* PSR ¶¶ 49-64.  The resulting Guidelines range (without

the aggravated identity theft penalties) for total offense level 16 and CHC VI is thus 46-57

months of imprisonment.

Given that Finkler also pleaded guilty to two counts of aggravated identity theft under 18

U.S.C. § 1028A, he is also subject to two 24-month sentences of imprisonment, which may be

imposed concurrently or consecutively to each other, but must be imposed consecutively to the sentence for the underlying offenses of access device fraud and wire fraud.  *See* 18 U.S.C. § 1028A(b)(2) & (4).  The Court also must not reduce the sentence for the underlying offenses to compensate for the fact that at least one additional 24-month term will be added.  *See* 18 U.S.C. § 1028A(b)(3).  As explained further below, the Government believes the two 24-month sentences should be imposed consecutively to one another, resulting in an effective Guidelines range of 94-105 months of imprisonment.  If the two 24-month sentences are imposed concurrently to one another, the effective Guidelines range is 70-81 months of imprisonment.

The non-exhaustive list of factors the Court must consider in deciding whether to impose the 24-month aggravated identity theft sentences concurrently or consecutively include:  (i) the nature and seriousness of the underlying offenses; (ii) whether the underlying offenses are groupable under U.S.S.G. § 3D1.2; and (iii) whether the purposes of sentencing set forth in Section 3553(a)(2) are better achieved by imposing a concurrent or a consecutive sentence for multiple counts of 18 U.S.C. § 1028A.  *See* U.S.S.G. § 5G1.2, Application Note 2(B).  While factors (i) and (ii) arguably support concurrent 1028A sentences because the underlying offenses of access device fraud and wire fraud are not crimes of violence and are groupable, factor (iii)— the most holistic of the factors—supports consecutive sentences.

To begin, the 1028A convictions relate to two entirely separate identity theft schemes perpetrated by the defendant during distinct time frames:  one victimized the small business owners in Wallingford in 2017 and the other victimized numerous gym patrons around the state in 2019.  Fraud crimes of this nature unsettle their victims, leaving them to feel vulnerable about the state of their finances and to worry about whether their credit card companies will protect them from the financial impact of the fraud crime.  Indeed, many victims in this case reported

that their credit card companies initially did not want to cover the fraudulent charges because the cards were physically scanned for the charge (as opposed to being used, for instance, on the Internet by a fraudster).  By the companies' logic, the credit card owner must have authorized the charge since the card was physically scanned by Finkler.  Once the companies were notified that the customers' wallets were burglarized, they did cover the losses.  But in the interim, the victims were left wondering whether they would be held responsible for thousands of dollars in fraudulent charges racked up by Finkler.

Moreover, Finkler is only going to be convicted of two 1028A offenses, when he was charged with several others (and could have been charged with even more, given his conduct in the gym-related fraud).  Being convicted of only two consecutive 24-month sentences thus understates his true criminal liability.

Finally, as discussed further below, Finkler's unabated history of criminal conduct demonstrates both that he is a public menace and a dangerous financial fraudster.  This is not Finkler's first federal offense, or even his second, third, fourth, or fifth.  It is the sixth time he stands before a federal court convicted of fraud crimes, though he has never before been convicted of violating Section 1028A.  His prior sentences for wire fraud and bank fraud crimes certainly have not deterred him in the past; perhaps the extra 48 months that would result from consecutive 1028A sentences will be the deterrent Finkler needs to refrain from criminal conduct in the future.  At the very least, consecutive sentences will afford the public four extra years of protection from Finkler's crimes.

## V.    DISCUSSION OF 3553(a) FACTORS

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The Government highlights what it views as the most significant of the § 3553(a) factors below.  Analysis of these factors supports an above-Guidelines sentence of imprisonment of 120 months, followed by the maximum term of supervised release of three years.

### Seriousness of the Offense

Credit card fraud, especially when perpetrated by burglary, is a serious affront to a victim's sense of personal and financial security.  The Wallingford small business owners

victimized by Finkler trusted him to do his job—taking inventory of auto parts—and ended up with credit card bills of nearly $21,000 charged fraudulently by Finkler.  Had one of the credit card companies not alerted H.R. to the possible fraud, that number could have been significantly higher.  Finkler's fraudulent purchases were not for necessities; instead, he spent the majority of the $21,000 at day spas, yacht clubs, jewelry stores, technology retailers, upscale clothing retailers, and drug stores (likely to purchase gift cards that he could use without the purchases being traced back to him).  *See* PSR ¶ 9.

Finkler's gym-related fraud, too, invaded the victims' sense of security.  To begin, Finkler stole G.T.'s identity under false pretenses.[4]  And Finkler kept that information in his back pocket for several months, biding his time until he could use it to generate a new fraud scheme once released.  The victims at the gym were going about their day exercising, without worrying that their wallets in the locker rooms were being burglarized and their credit cards exploited.  Finkler's *modus operandi* of placing the credit cards back into the wallets after charging them was especially nefarious, as that prevented the victims from noticing the theft and fraudulent charge for some time.

And while the credit card owners face the individual financial insecurity that resulted from Finkler's behavior, there is also another entire class of victims here:  the banks and financial institutions that ultimately backstopped the customers' losses.  These institutional victims protect the individual customers from having to bear losses caused by fraud, but ultimately are left to carry those losses.  The restitution figure of $145,657.06 will be owed to these banks.

---

[4] The Government notes that this was not the first time Finkler victimized a fellow prisoner.  *See* PSR ¶ 57.

It is clear that these were not crimes of impulse, as they required several steps of planning and execution. Finkler first had to steal the identity of G.T. using false pretenses while both men were in prison transit in April of 2018. Finkler then kept G.T.'s PII for several months, until Finkler was released in September of 2018. Shortly thereafter, he signed up for the PayPal account using the initials of his girlfriend and for the Squared-Up and Clover/First Data payment processing services using G.T.'s information, in order to insulate himself from the transactions that would occur through these accounts.

Finkler's sentencing memorandum suggests that his bipolar disorder must be to blame because he linked his own bank account to these accounts and provided some other information, such as an address and an email address, that could be traced to him. While those facts certainly made it easier for investigators to identify Finkler as the perpetrator, it remains true that in the first instance, by creating accounts using the initials of his girlfriend and of G.T., Finkler intended to insulate himself and evade detection. Luckily, the investigators probed who was behind the JS Ventures and GT Limited accounts and found the true criminal: Finkler.

In Finkler's 2013 sentencing hearing before this Court, Attorney Ward argued to the Court that Finkler's previous crimes were the "products of an impulsive kind of manic phase" of Finkler's bipolar disorder. *See* Exhibit A at 36-37. In response, the Court correctly noted that, in one of Finkler's prior crime sprees, he defrauded a carpet dealer multiple times over three days in a row, to which Attorney Ward responded that manic phases can last a week or more. *Id.* at 37. But, assuming that manic phases can last a week or more, it is not clear to the Government that manic phases could last weeks or months, which were the lengths of the crime sprees at issue in the instant case. The Wallingford victims' cards were fraudulently charged by Finkler over a three-week period in August of 2017. And the gym related fraud began in September of

2018 with the opening of the PayPal account and proceeded until Finkler's arrest in May of 2019. Certainly, a manic phase cannot explain away this sustained and carefully-orchestrated criminal conduct.

Finkler's sentencing memorandum also draws a number of comparisons to corporate fraudsters who were responsible for defrauding investors of millions of dollars, noting that the sentencing judges in those cases did not rely on the loss table from U.S.S.G. § 2B1.1 to determine the ultimate sentences. But those are not apt comparators to Finkler's case. The loss amount here, unlike in many of those cases, is easily calculable and undisputed. And Finkler is not in the same category as those other defendants, given his long and nearly uninterrupted pattern of criminal conduct that stretches nearly 39 years.

In sum, Finkler's offenses were serious. He victimized 53 people as part of the Wallingford scheme and the gym-related scheme. An above-Guidelines sentence of 120 months' imprisonment is justified.

<u>Finkler's History and Characteristics; Respect for the Law; Just Punishment; Deterrence</u>

As the PSR recounts in detail, Finkler began his criminal career in 1982 at the age of 18 by stealing a small sum of money from a cash register at a store where he worked. Over the course of the next nine years, the defendant engaged in a series of petty scams and larcenies, but ultimately cultivated more extensive and elaborate schemes that led to the first of what would be five federal fraud convictions. As detailed below, the defendant often committed these crimes while on supervised release and in one instance, while he was incarcerated. His victims ranged from individuals to companies. Indeed, he even used his own mother in furtherance of his fraud.

     ***A.     The First 1993 E.D.N.Y. Conviction and the 1998 Supervised Release Violation***

As detailed in the PSR, over the course of a single year from June 1990 through June

1991, the defendant operated a fraudulent telemarketing operation which involved selling and receiving payment for merchandise through fraudulent representations; demanding payment from victims for shipments of merchandise they did not order; making unauthorized charges on victims' credit card accounts and making unauthorized charges on stolen credit cards. The fraudulent orders taken from 30 victims totaled $133,739.43. For this crime, the defendant was sentenced on April 16, 1993 to 46 months in prison and three years of supervised release. He was released from custody on March 14, 1997.

Within six months of his release, he engaged in yet another fraud. Using his position as an employee at a long-distance telephone service provider, the defendant defrauded a customer out of goods worth approximately $280,000. When confronted by the victim, the defendant allegedly hit the victim over the head with a metal chair and fled from the store. For this violation, the defendant was sentenced on April 10, 1998, to 24 months in prison.

### B.      The Second 1993 E.D.N.Y. Conviction

While on bond for the federal fraud detailed above, the defendant engaged in a further fraudulent scheme. Specifically, within three months of his arrest for the previously discussed fraud, the defendant entered into a fraudulent agreement with a company called CSM Environmental System, Inc. ("CSM") pursuant to which CSM acquired Finkler Laboratories, Inc., and employed the defendant to run a newly established subsidiary of CSM, called CSM Environmental Laboratories, Inc., ("CSM Labs"). On the Employment Agreement, Finkler made two false representations to CSM: (1) he denied having any pending litigation against him, when in fact, he had been arrested and indicted and (2) he submitted to CSM a 1990 Federal Corporate Tax Return that showed he made $1,803,541 in sales for 1990 when in fact he had only made $272,394.

At the end of August 1991, CSM issued a check to Finkler for $25,000 as a lump sum advance payment for having entered into the Employment Agreement. While employed at CSM, Finkler submitted fraudulent business expense reimbursement vouchers to CSM for which CSM paid him a total of $63,469.60.  He used all of this money his personal gain, buying two Rolex watches, a 1992 leased BMW, a mink coat, and making payments on his former condominium in Great Neck, New York, Notably, the checks were made payable to various individuals and filtered through their accounts, with proceeds given to the defendant in return for his payment to the individuals he solicited. Finally, CSM estimated that 75 percent of all the sales the defendant claimed were made by his subsidiary (approximately $175,000) were false.

For this fraud conviction, he was sentenced on April 16, 1993 to 46 months in prison to run concurrently with his other federal sentence and, for committing the crime while on bail, he was sentenced to 11 months' imprisonment to run consecutively.

### C.     The 2002 S.D.N.Y. Conviction

In 2001, Finkler, while an employee of Teligent Inc., a telecommunications company, defrauded the company by submitting fraudulent sales contracts in order to receive commissions. He did this by forging names and signatures, making false statements and submitting false documents. Mr. Finkler was responsible for a loss of between $30,000 and $70,000. The Court ordered that Mr. Finkler undergo psychiatric testing and treatment.  For this conviction, the defendant was sentenced on January 3, 2002, to 27 months in prison and three years of supervised release.

### D.     The 2005 E.D.N.Y. Conviction

As detailed in an indictment issued in October of 2003, the defendant engaged in three more distinct frauds, some of which occurred within months of his arrest for the Teligent fraud

and two of which occurred while he was incarcerated.  In the first, over the course of a year from

February 2001 and to January 2002, the defendant falsely represented to a colleague that the

defendant had real estate investment opportunities with Chase Properties in which the colleague

could invest. In order to convince the colleague of the legitimacy of the investments, the

defendant created emails which purported to come from real Chase employees. The emails

provided information about the investments, specifically, real property for sales at reduced rates.

Through the course of the scheme, the colleague provided the defendant with a total of $59,571

for alleged down payments and other related expenses for the real estate. The money was never

repaid. When the colleague attempted to locate the defendant to demand repayment, the

defendant instructed an associate to tell him that the defendant suffered a heart attack and was

hospitalized. Moreover, when the colleague contacted the defendant's wife to corroborate the

story, the defendant's wife, Sara Finkler, implied that her husband was in the hospital, when in

fact, he was incarcerated at the Federal Correctional Institute at Fort Dix, New Jersey.

The defendant perpetrated the second fraud while incarcerated at Fort Dix.  There, he

defrauded a fellow inmate of $17,875 by falsely representing to him that the defendant was

investing money in a non-existent company, Infoport Communications Group ("ICG") and that

the inmate could do so as well at a discount prior to an initial public offering of the company's

shares. At the defendant's direction, the inmate wrote a check to We Got It, Inc. ("WGI") – a

company that the defendant purported was a clearinghouse of ICG. WGI was a company

incorporated in the State of New York on August 29, 2000, and the defendant and his wife were

listed as its officers. In March 2002, Steven Finkler instructed his wife to open a bank account at

JP Morgan Chase in the name of WGI. That account listed Sara Finkler as the president of WGI

and signatory on the account. She later deposited the inmate's check for $17,875 into the

account.

The final scheme occurred between August 2000 and January 2003 – both before and during his incarceration.  In this scheme the defendant obtained numerous credit cards from various credit card issuers. On most of the accounts, he was either a joint card holder with his mother or an authorized user of cards of which his mother was the primary holder.  He ran up charges in these accounts, leaving unpaid balances. When the credit card issuers sought payment, the defendant forged correspondence and bank documents to create the appearance that his mother was writing to the issuers, claiming their identities had been stolen and that they had not incurred the charges. At this time, Finkler's mother was either in the final stages of cancer or deceased. The case agent advised that the fraud loss totaled $412,996.80.

For these schemes, the defendant was sentenced on October 28, 2005 to 92 months in prison and three years of supervised release.  He commenced his term of supervised release on that conviction on September 15, 2010.  By March of 2011, Finkler committed a series of Connecticut state crimes, including larceny through check fraud, that led to his supervised release revocation in Case No. 3:13-CR-79 (SRU).

### E.     *The 2013 District of Connecticut Conviction*

Between June 22, 2012, and July 26, 2012, Finkler executed a bank fraud scheme by forging checks that had not been lawfully issued to him in the amounts appearing on the forged instruments and depositing those checks into accounts he had at various financial institutions.  In one instance, he was able to withdraw the funds before the fraud was detected.  For this conduct, he was sentenced by this Court to 36 months' imprisonment and 60 months' supervised release, along with 14 consecutive months of imprisonment for the violation of his supervised release from his 2005 conviction.  Unsurprisingly, after his release from custody on the 2013 conviction,

he violated his supervised release conditions by being arrested again, multiple times.  On April 17, 2018, this Court sentenced Finkler to 14 months' imprisonment with no supervised release to follow.

At Finkler's sentencing before this Court in December of 2013, Finkler discussed a letter his son wrote lamenting how Finkler's crimes had affected the family.  *See* Exhibit A at 20-21.  As part of those remarks, Finkler said, in part:  "I can tell you right now, Your Honor, I will not let that child down ever again.  I understand that the Court would be concerned, worried, troubled about my future.  But I'm here today to tell you that my son's voice I hear in my ears every day, it resonates.  His embarrassment I hear, too.  … And I can say without any hesitation, I'm done, my family's done. … I'm sorry, I truly am, for my actions."  *Id.* at 20-22.

In connection with the upcoming sentencing, Finkler has echoed those sentiments in a letter to the Court, saying that he is "truly sorry to all of the victims" and that he will "never let [his son] down in the future."  *See* Docket #57-1, Defendant's Sentencing Memo, Exhibit A.  But those words ring hollow as Finkler stands before the Court yet again, having once again perpetrated a fraud against unwitting, innocent victims and utterly disrespected the law.  A term of imprisonment of ten years would be fair, and just, given Finkler's history and past sentences.  It would also be an incremental increase over his longest sentence of 92 months.

Finkler suggests that his mental health issues, particularly his diagnosis of Bipolar Disorder II, is a reason for the Court to depart downward from the Guidelines range.  He also details a number of studies that may provide guidance for treatment and supervision upon his release from custody.  While the Government accepts that Finkler has this diagnosis, his mental health issues cannot override the other important reasons for sentencing Finkler to a lengthy term of imprisonment—including promoting respect for the law, deterring Finkler and others from

committing similar crimes, imposing a just punishment, and, as discussed below, protecting the public.

<u>Protection of the Public</u>

Protecting the public is perhaps the most important reason for imposing a ten-year sentence of imprisonment for Steven Finkler. While Finkler's past crimes have certainly had victims, including companies, banks, and individuals, the conduct for which he stands before the Court now is undoubtedly the most far-reaching and widespread of all of his many crimes. In addition to stealing the identity of G.T. under false pretenses, Finkler charged 52 people's credit cards as part of his two schemes, resulting in a total of 53 known individual victims and numerous bank victims. The Court should have no confidence that, if Finkler were to be sentenced to a minimal term of imprisonment, he would not return immediately to criminal conduct that might harm an even larger pool of victims. The general public needs to be kept safe from Steven Finkler, and the most effective way of accomplishing that is a very long prison sentence.[5]

## VI.   **RESTITUTION**

Finkler agreed in the plea agreement to pay restitution in the amount of $145,682.08. That figure has since been adjusted to $145,657.06. The Government will provide a proposed restitution order, along with a schedule of the amounts owed to each financial institution, to the Court.

## VII.   **CONCLUSION**

In sentencing Finkler in 2013, this Court highlighted the need for any future sentences imposed on Finkler to be longer than those imposed upon him in the past:

---

[5] The Government realizes that, given Finkler's history, he may once again victimize his fellow inmates. But incarceration protects a larger group of people—the general public—from Finkler.

But the things that are driving your sentence here today are the other three purposes:  The need to punish.  You're somebody who keeps doing the same wrongful conduct over and over, and you need to learn from your mistakes. You haven't yet.  I'm hoping that this sentence will help you do that.  But you need to be deterred, **you need to understand the sentences are going to get longer, they are not going to get shorter.**  No judge with your record is going to look at you and say, oh, I'm optimistic that he understands things now.  You're way past that point.  **You're at the point where every time you come into court, if you ever come into court again, you're going to be looking at what is the most that the judge can do to punish you, to deter you, and to protect the public from you.**

*See* Exhibit A at 46-47.  (Emphasis added.)  The same concerns motivating the Court in 2013 remain present today.  Although the Government acknowledges that upward departures from the Guidelines range are unusual, this case is merits an exception.  Whatever sentence of imprisonment is imposed, the Court should impose the maximum term of supervised release of eight years in order to help protect the public when Finkler is released.

The Government thus respectfully requests a sentence of ten years' imprisonment with eight years' supervised release and restitution of $145,657.06, which will punish Finkler, (hopefully) will deter him, and will protect the public from him.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

By:   SARALA V. NAGALA
ASSISTANT U.S. ATTORNEY
Fed Bar No. phv05529
157 Church Street, 25th Floor
New Haven, CT 06510
(203) 821-3700

- 22 -

CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2021, a copy of the foregoing document was filed electronically via CM/ECF.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.


Sarala V. Nagala
Assistant U.S. Attorney