Exhibit A

```
1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT
2

3       UNITED STATES OF AMERICA)
                                )
4       vs.                     ) No: 3:13CR-00079 SRU
                                )
5       STEVEN FINKLER,         )
                                )
6            Defendant.         )

7
                            SENTENCING
8

9

        PRESIDING:  HONORABLE STEFAN R. UNDERHILL, USDJ
10
        APPEARANCES:
11
                ON BEHALF OF THE GOVERNMENT:
12
                        U.S. ATTORNEYS OFFICE
13                          1000 Lafayette Boulevard, 10th FL
                            Bridgeport, Connecticut 06604
14                      By: VANESSA RICHARDS, ESQUIRE
                            Assistant U.S. Attorney
15
                ON BEHALF OF THE DEFENDANT:
16
                        FEDERAL PUBLIC DEFENDERS OFFICE
17                          10 Columbus Boulevard, 6th FL
                            Hartford, Connecticut 06106
18                      By: TERENCE WARD, ESQUIRE
                            Assistant Federal Public Defender
19

20

21

22
        December 4, 2013
23
        United States Courthouse
24      United States District Court
        915 Lafayette Boulevard
25      Bridgeport, Connecticut 06604
```

SUSAN E. CATUCCI, R.M.R. AND OFFICIAL COURT REPORTER

```
1                    (2:05 O'CLOCK P.M.)

2                    THE COURT:   Good afternoon.  We're

3      here for sentencing in the matter of United States

4      versus Steven Finkler.  Could I have appearances,

5      please?

6                    MS. RICHARDS:  Good afternoon, Your

7      Honor.  Vanessa Richards for the government.  Also

8      seated at counsel table for the government is

9      Special Agent Jason Breen with the FBI.

10                    THE COURT:   Thank you.

11                    MR. WARD:  Terence Ward from the

12      Federal Public Defender's Office.  With me is

13      Steven Finkler, Your Honor.

14                    THE COURT:   And Ray Lopez, Senior

15      Probation Officer, is also with us in court today.

16                    And let me, first off, apologize for

17      the delay in starting these proceedings.  I had a

18      trial this morning that took much longer than it

19      should have and, as a result, I've gotten behind.

20                    But let me note that Mr. Finkler

21      appeared before me on April 23rd of this year and

22      at that time entered a plea to Count 1 of an

23      Information charging him with bank fraud in

24      violation of 18 USC Section 1344.  I should note

25      that that conduct also gave rise to a supervised
```

1      release violation petition, and it's my

2      understanding that all counsel are in agreement

3      that today we should be sentencing Mr. Finkler on

4      both the underlying conviction as well as the

5      petition to the violation of supervised release.

6                      MR. WARD:  Yes, Your Honor.

7                      MS. RICHARDS:  Yes, Your Honor.

8                      THE COURT:   All right, very good.

9      In preparation for sentencing, I've reviewed the

10     PSR which was dated October 3rd, 2013.   I've also

11     reviewed the first addendum to the PSR which is

12     dated the same date and relates to an objection

13     filed by way of email from Mr. Ward, which I

14     reviewed.  And in preparation for sentencing, I've

15     also reviewed the Defendant's Memorandum in Aid of

16     Sentencing dated November 26th; two memorandums

17     from the government, both dated November 29th;

18     obviously the plea agreement, and I should note

19     that there were materials attached to --

20     principally letters attached to the Defense

21     Memorandum and a chart attached to the

22     Government's Memorandum, and I've reviewed those

23     as well.

24                      Mr. Ward, have you and Mr. Finkler

25     had a chance to review the PSR and the addendum to

1      that report?

2                  MR. WARD:  Yes, Your Honor.

3                  THE COURT:   And do you have any

4      objections to any of the factual statements set

5      forth in there?

6                  MR. WARD:  We actually do, Your

7      Honor.  I raised with Mr. Lopez, it's not a big

8      issue but I raised with Mr. Lopez the statements

9      in paragraphs 2 and 37 regarding Mr. Finkler's

10     custodial status.  I know Mr. Lopez attempted to

11     correct the statement in paragraph 2 but I still

12     don't think it's quite right.

13                 Basically Mr. Finkler is in federal

14     custody.  He's not in federal custody -- he's not

15     on a federal detainer; he's just plain in federal

16     custody.  So, from May 12th -- May 14th of 2012 to

17     June 22nd of 2012, he was held at -- I'm sorry,

18     from February 14th of 2012 to June 22nd, 2012, he

19     was held at the Wyatt Detention Center because he

20     was detained as a result of the supervised release

21     violation.  After that, he was released and then

22     he was remanded again on July 26, 2012 to the

23     present, where he's been at Bridgeport

24     Correctional Center, but on the federal charges

25     that are the subject of this indictment.  So, not

1       on a detainer, but on these charges.   So, it's

2       important that it be in the presentence report so

3       the Bureau of Prisons will award credit for those

4       times.

5                     THE COURT:   Okay.

6                     MR. WARD:   And I think Mr. Lopez and

7       I can work out language --

8                     THE COURT:   Yes, you said --

9                     MR. WARD:   -- to include in the

10      presentence report.

11                    THE COURT:   -- paragraph 2 and

12      paragraph 37?

13                    MR. WARD:   That's right.   37 is the

14      very last paragraph, I believe, subparagraph of

15      37.   It's on page 13.

16                    THE COURT:   Yes, I see it.

17                    MR. WARD:   But, otherwise, there are

18      no objections, Your Honor.

19                    THE COURT:   All right.   I think

20      those changes should be made.

21                    MR. LOPEZ:   Sure.

22                     THE COURT:   So Mr. Finkler gets

23      appropriate credit for the time he spends in

24      federal custody.

25                    MR. LOPEZ:   Sure.   Mr. Ward and I can

1          write it together essentially.

2                    THE COURT:   That's helpful, thank

3          you.  Were there other objections?

4                    MR. WARD:  Thank you, no, thank you.

5                    THE COURT:   Ms. Richards, has the

6          government had a chance to read the PSR?

7                    MS. RICHARDS:  Yes, Your Honor.

8                    THE COURT:   Any objections to any of

9          the factual statements there?

10                    MS. RICHARDS:  No.

11                    THE COURT:   This is not exactly a

12          factual statement but, before I forget, I just

13          want to note for the record that paragraph 17 and

14          28 that cites to the sentencing guidelines, I've

15          reviewed that with Mr. Lopez and that change will

16          be made.

17                    MR. LOPEZ:  And, Your Honor, also

18          I'll revise paragraph 16 to say that we're

19          applying the November 1, 2013 manual, which there

20          aren't any amendments to that effect, so I'll see

21          to that.

22                    THE COURT:  Yes, thank you.  All

23          right.  With the forthcoming amendment that was

24          noted regarding Mr. Finkler's custodial status,

25          I'm going to accept the factual statements of the

1    PSR as the findings of fact of the Court in this

2    case.  I'm also going to accept the plea agreement

3    that was signed on April 23rd, 2013, being

4    satisfied that it adequately reflects the

5    seriousness of the actual offense behavior and

6    that accepting it will not undermine the purposes

7    of sentencing.

8              I want to review separately the

9    maximum penalties for both the underlying offense

10   and for the supervised release violation.  Feel

11   free to be seated, by the way, if you prefer.

12             On the underlying offense, the

13   violation of 18 USC Section 1344, Mr. Finkler

14   faces a maximum term of 30 years in prison, a

15   maximum fine of $1 million, a term of supervised

16   release of at least two years and up to

17   five years, with any violation of a term or

18   condition of supervised release subjecting him to

19   up to three more years in prison for that

20   violation.

21             The Court is going to order

22   restitution in this case in the amount of

23   $9,828.83 to be paid to Sovereign Bank, and I am

24   required to impose a mandatory special assessment

25   on the underlying conviction.

1             With respect to the supervised

2      release violation, the maximum penalty is

3      two years of incarceration and up to three years

4      of supervised release.   That three year period

5      needs to be adjusted to reflect, by subtracting

6      the months of imprisonment, if any, imposed for

7      the violation from the total available supervised

8      release.   In other words, should Mr. Finkler

9      receive two years incarceration, his maximum

10     supervised release term would be reduced from

11     three years to one year for the supervised release

12     violation.

13             Any correction to that statement of

14     the maximum penalties for the underlying

15     conviction or for the supervised release

16     violation?

17             MR. WARD:   The Court's statement is

18     correct.   This might actually be a good time to

19     address one issue that the government had raised

20     in its memorandum, and that was effectively the

21     stacking of supervised release terms to come up

22     with a potential eight year term.

23             THE COURT:   No, that's not

24     permitted.   It's, my understanding --

25             MR. WARD:   Okay.

1                    THE COURT:   -- of the guidelines is

2       that supervised release terms are required to run

3       concurrently and I think that's true whether it's

4       a supervised release violation or an underlying

5       offense.

6                    MR. WARD:  That's right, Your Honor,

7       not simply because of the guidelines, but also

8       there a statute, 18 USC 3624(e), that specifies

9       that.

10                   THE COURT:   Yes, fair enough.  I

11      think the maximum supervised release term,

12      combined release term, would be five years.

13                   MR. WARD:  That is correct, Your

14      Honor.  Thank you.

15                   THE COURT:   Okay.  All right, let's

16      turn then to the guidelines, the sentencing

17      guidelines calculation, which I think has been

18      accurately set forth in the PSR, but I'd be happy

19      to hear any objections to this calculation.

20                    There's a base offense level of

21      seven, six levels are increased because of the

22      amount of the intended loss; two levels are added

23      because of the conduct that Mr. Finkler engaged in

24      that constituted obstruction of justice.  That

25      gives us an adjusted offense level of five.  Two

1       levels are subtracted for acceptance of

2       responsibility, which results in a total offense

3       level of 13.   Mr. Finkler is in Criminal History

4       Category 6, and the resulting sentencing guideline

5       range on the underlying conviction is 33 to

6       41 months of imprisonment, two to five years of

7       supervised release, a fine of 3,000 to $1 million,

8       restitution in the amount that I recited earlier,

9       and a special assessment of $100.   And the

10      guideline range for the supervised release

11      violation is 21 to 24 months of imprisonment.

12                  Any objection to that calculation of

13      the sentencing guidelines or that statement of the

14      resulting sentencing guideline range?

15                  MS. RICHARDS:   None from the

16      government.

17                  MR. WARD:   No, Your Honor.

18                  MR. LOPEZ:   I'm sorry, Your Honor, I

19      think there might be, though I'm looking at the

20      PSR, on page 14 -- maybe the numbers are not right

21      but page 14, right above the criminal history

22      computation is a paragraph that talks about

23      37b1.4a, the guideline for revocation of

24      supervised release, but it contemplates a Grade A

25      Felony, and I'm not sure if this setting a range

1       of 31 or -- 33 to 41 months, but that's maxed at

2       24 months, so that does need to be corrected.

3                   MS. RICHARDS:  No.  The issue is what

4       was the violative conduct, if you will.  There is

5       an issue about whether or not when Your Honor

6       released Mr. Finkler at the Government's request,

7       whether or not he was on supervised release such

8       that that would, that particular aspect of the

9       guidelines would kick in or the statute would kick

10      in.  I think that a determination was made that

11      there were a couple of land mines with going that

12      route, so the Defense and the Government agreed

13      that the violative conduct would be the state

14      crimes that led him to be incarcerated on the

15      supervised release violation coming out of his

16      last federal conviction, which are state crimes of

17      particulars which are, I believe, Class B

18      Felonies.  And so, as a consequence, that's why he

19      is where he is.  If that makes sense.

20                  MR. LOPEZ:  It does, and so what I'm

21      going to do, I'll further revise that paragraph to

22      identify this as a Grade B and a range of 21 to

23      24 months.

24                  THE COURT:  Okay.  I think that

25      makes sense.  All right.


SUSAN E. CATUCCI, R.M.R. AND OFFICIAL COURT REPORTER

```
 1                    Mr. Ward, let me turn to you with
 2        whatever comments you'd like to make about an
 3        appropriate sentence in the case.  Mr. Finkler, I
 4        will hear from you if you wish to make a
 5        statement.  You're not required to say anything
 6        but I would be interested in hearing whatever you
 7        might choose to say.  And then I'll hear from Ms.
 8        Richards.
 9                    MR. WARD:  Thank you, Your Honor.
10        Your Honor, I've had a number of clients over the
11        years who were bipolar.  And, in particular, I
12        recall a police officer who walked into a Mercedes
13        dealership, test-drove a car and wrote a $72,000
14        check for the car, the full price, and drove it
15        off the lot.  He had less than a thousand dollars
16        in his bank account at the time, and I remember
17        having this discussion about how could you even
18        think that you could do that?  How do you think
19        you wouldn't get caught and be punished for this?
20        Because you used your personal check, you left the
21        drivers license information.  As I recall, I
22        think that he even wore his uniform when he did
23        it.  And the response basically was, when you're
24        in a manic phase, you don't worry about the
25        consequences.  You know it's not right but you
```

1    just don't worry about the consequences.  You

2    worry about them later.

3                The conduct in this case, in

4    particular, the check from Wyatt, of all places,

5    to take a, you know, 40 or whatever-dollar check

6    and to add $6,000 to it and deposit it in your own

7    account, it's that kind of behavior that, that

8    results I think from having a mental illness.  And

9    he's not insane, it's not that he's not capable of

10   controlling impulses, but people make very bad

11   choices.

12               Now, the government in this case says

13   to a certainty Mr. Finkler will offend again, and

14   obviously I can't come here and say that's not

15   within the realm of possibilities.   Certainly it

16   is, his past history indicates that, but I think

17   there are three reasons today why it's likely that

18   he won't offend again.

19               And the first is that, maybe for the

20   first time, he is properly medicated and compliant

21   with the medications.  He is taking a mixture of

22   or a combination of Lamictal, a drug he's never

23   had before, and Prozac.  And his anxiety levels,

24   which will often drive some of this conduct, that

25   he has, seem to be very much reduced.   He feels

1    better, he feels calmer.  He doesn't feel as

2    manic, kind of impulsive anymore.  He's been

3    taking these drugs for approximately 18 months

4    now.

5              Secondly, he is in counseling with

6    Rabbi Prousnick (ph), who is present in the

7    courtroom and would like to address the court

8    after I speak today.

9              And in going back just for a second

10   to the medications, he's not under court orders to

11   take these medications.  He's not required to do

12   it.  He's doing it because he wants to be better.

13   The same thing with the counseling.  No one is

14   requiring him to see the Rabbi.  He's been seeing

15   him for almost a year now.  He's in counseling

16   because he realizes that he has basically laid

17   waste to everything that matters to him.  He's

18   lost his family.  His wife has divorced him.  He

19   has limited contact with his son.  He's only

20   spoken on the phone with him.  He was very close

21   with his son.

22             He's not a person -- I think the

23   government would portray him as a sociopath --

24   he's not a person who is incapable of having

25   feelings for other people, and I think that the

1          letters that were submitted with my sentencing

2          memorandum, the statements that his ex-wife made

3          to the probation office that are reported in the

4          presentence report, indicate otherwise, that this

5          is a person who, A, people love.  I don't think

6          you can, you can attract love if you are a

7          sociopath.  You have to give something to get

8          something back, and he has demonstrated over the

9          years with family that he does care about people.

10         It's just sometimes he goes off the rails, too

11         frequently certainly.

12                    He is not, though, I think, a person

13         that is incapable of feeling empathy for others,

14         and that's one of the reasons that he is in

15         counseling, that he wants to be better.  He wants

16         very much to repair the relationship he has

17         especially with his son.

18                    And that is the third reason, that he

19         has lost his wife and son.  You know, he was

20         married for 12 years.  He has come to learn that

21         people won't stand by you forever while you do

22         things that hurt them.  And so his wife is gone,

23         and he has the sobering experience of having to

24         realize that his son is ashamed of him, and that's

25         a hard thing to tolerate.

1            So, the government says there's no

2    hope here but I think I see it otherwise, that if

3    he stays compliant with his meds, if he stays in

4    counseling and if he really wants to earn back the

5    trust, the love of his ex-wife and son, that he

6    realizes he has no choice but to make changes, to

7    reform here.

8            He also realizes he's alone at this

9    point.  His aunt, who was his, you know, perhaps

10   his loyalest supporter, has died; his wife has

11   divorced him; and his son, you know, his son only

12   occasionally speaks to him on the phone.  So, I

13   have some hope for him because I think he is

14   undertaking a serious effort to address the

15   behaviors that got him here.  He's taking the

16   medications, he's seeking counseling and he's

17   trying again to restore that relationship that

18   matters so much to him.

19           I'm not suggesting for a second that

20   he doesn't get punished in this case.  He's

21   earned -- he should go to jail and we're asking

22   that the court incarcerate him on, I suggested a

23   period of 36 months.  We'll know soon enough after

24   he's released whether this has taken or not.   If

25   -- we don't have to wait eight years to find out

1    if he's going to mess up on supervision.  We'll

2    know right away.  If he does, you can punish him

3    again but, but the three year term for a person

4    who is 49-years old is significant.  It's going

5    to be hard time for him because, again, he is very

6    much alone here.  His time will pass slowly.

7            I think the most important thing is

8    he knows what he has lost and he knows he has

9    precious little time to repair his relationship

10   with his son before his son -- his son is eleven

11   or twelve years old now.  Once he's in his, you

12   know, teens and driving, if that relationship

13   isn't repaired by then, he knows it's going to be

14   difficult to ever put it back together.  His son

15   will have his own life and will have left his

16   father behind.  This is his son, this is his

17   chance, so that's why I think there is some hope

18   here that Mr. Finkler can make some important

19   changes.

20            To address at least some of those, I

21   think I would ask, if it's okay right now, for the

22   Rabbi to address the Court.

23            THE COURT:  Sure.

24            RABBI PROWSNICK:  Rabbi James

25   Prousnick, Your Honor.

SUSAN E. CATUCCI, R.M.R. AND OFFICIAL COURT REPORTER

1               THE COURT:   Thank you.

2               RABBI PROUSNICK:   I thank you, Your

3     Honor, and I'm pleased to be here.  As Mr. Ward

4     said, I've been visiting with Steven Finkler for

5     almost a year now.   That was on the request of

6     Iman Mahteed Mohammed (ph), the Chaplain at the

7     Bridgeport Correctional Center.  I'm a local Rabbi

8     and he asks me from time to time when there is a

9     Jewish inmate to visit with the, with someone in

10    the facility.  So I began contact with Steven

11    about a year ago and I've been meeting with him

12    pretty regularly, almost once a month or at least

13    once a month since that time.  And, over that

14    time, I've sensed in him deep regret, both for

15    what he did and, most significantly, for the hurt

16    that he's caused a lot of other people, especially

17    those within his family.

18               From my conversation and from my

19    faith, it's hard for me to agree with terms like

20    "not reformable" or "no moral compass."   I always

21    hold out room for repentance and for redemption.

22    And echoing some of the words of Attorney Ward,

23    with counseling and with continued treatment for

24    some significant mental health issues, I've sensed

25    that possibility for Mr. Finkler over the time

1    we've been talking.  I have, you know, sensed that

2    he's a loving father, and I like the way he talks

3    about his son.   I like the way, if I can phrase

4    it that way, that he grieved about the death of

5    his aunt who he didn't get to see or attend her

6    funeral while he was incarcerated, and I have a

7    powerful feeling of the father he would most like

8    to be.   He's never blamed anyone else for his

9    circumstances.   And with me, he has always been

10   respectful, appreciative and hopeful.   And I know

11   that he wishes to make amends and to rebuild his

12   life and to reconnect with his family as best as

13   he possible can as he moves forward.  Thank you.

14              THE COURT:   Thank you.   Thanks for

15   your good work, too.

16              MR. WARD:  And, Your Honor, Mr.

17   Finkler wants to address the Court, also.

18              THE COURT:  Okay.

19              THE DEFENDANT:   Good afternoon, Your

20   Honor.

21              THE COURT:   Good afternoon.

22              THE DEFENDANT:  Well, I finally know

23   what rock bottom means, Your Honor.  I've hit rock

24   bottom.   People that suffer from drug addiction,

25   I never knew what that meant when they say that

1    they've hit rock bottom, but I've hit it.   And

2    unfortunately, or maybe fortunately, I'm not

3    suffering from drug addiction but I am suffering

4    from some sort of anxiety or depression which has

5    basically taken over my life and controlled me.

6              As Mr. Ward has said, I have lost my

7    wife through the divorce and my family is split

8    apart, is torn apart, and I've done that, not she,

9    not my son.  I've done that myself.   And I can't

10   believe I've done this over and over to my wife,

11   or now my ex-wife, and my son.   But I have, but

12   maybe if I would have been divorced years ago or

13   something would come to a head, maybe then I would

14   have woke up and said, you know, I truly need

15   help, and maybe then I wouldn't have destroyed my

16   family.

17              A few months ago my son saw my wife

18   writing a letter to the Court, which Mr. Ward

19   forwarded to Your Honor.  And kids are

20   inquisitive, and he figured out what was going on

21   and he started to write a letter to Your Honor,

22   and I asked the letter not be sent to Mr. Ward or

23   yourself, because the letter was devastating.   It

24   basically stated everything that's happened to him

25   because of what I've done, with respect to not

1          being home for him, not being able to take him

2          places, not being able to do certain things

3          because I'm not there with him, and I think the

4          most damaging thing that he said in that letter

5          was how I've embarrassed him for what I've done.

6          And I don't want anyone to read a letter like that

7          from a child, because it tore me apart and I can

8          tell you right now, Your Honor, I will not let

9          that child down ever again.

10                    I understand that the Court would be

11         concerned, worried, troubled about my future.

12         But I'm here today to tell you that my son's voice

13         I hear in my ears every day, it resonates.  His

14         embarrassment I hear, too.  So, that's one of the

15         things I wanted to tell you.

16                    Over the past year, as Mr. Ward said,

17         I've been on new medications for mental health and

18         I believe this is one of the things that separates

19         the past from the present and maybe even the

20         future.  Because I do notice changes, and the

21         reason why I notice changes is because people I

22         speak to say, you sound different, you act

23         different, you talk different, so my anxiety is at

24         a minimum.  I don't have any need for a quick fix

25         right now.  I don't believe that the impulses are

```
1          there that were there prior without being on these
2          medications, and the key thing is to stay on the
3          medications.  And I can say without any
4          hesitation I'm done, my family's done.  I've
5          destroyed the family.  Like I said before, it's
6          not their fault, it's my fault.  They're being
7          punished for me and that is the ultimate
8          punishment now, something the Court can never do.
9                    I'm sorry, I truly am, for my
10         actions.  Whether the government would like to
11         believe that or not, I truly am.  I'm planning to
12         stay on the medication.  I'm planning to stay in
13         counseling.  I cannot stop.  It's got to be
14         number one in my book.  And also, meeting with
15         Rabbi Prousnick still on a regular basis, which
16         has been very, very good.  I want to thank the
17         Rabbi for all he's done.  He didn't have to do
18         everything he's done over the past year.  I have a
19         lot to prove to a lot of people, especially my
20         family getting back together, and I believe even
21         to the Court.  Again, thank you for listening to
22         me this afternoon, Your Honor.
23                    THE COURT:  Thank you.  Ms.
24         Richards?
25                    MS. RICHARDS:  I've appeared before
```

       1          this Court the most of all of the Courts that I've
       2          appeared before for sentencing, I've come before
       3          Your Honor the most.   And what I know about Your
       4          Honor is that you are unfailingly optimistic about
       5          the human spirit and you have tremendous
       6          optimistic for human behavior and their ability to
       7          overcome their worse natures, and I'm here to say
       8          respectfully that Your Honor's optimism will be
       9          lost on this defendant.
      10               This defendant is a serial
      11          recidivist.  I have seen nothing to indicate that
      12          he is at all capable of not committing a crime in
      13          the future.   If you look at the timeline that I
      14          attached to my sentencings memo, it indicates that
      15          literally, not once, but I believe twice, the
      16          defendant was arrested for one crime and, before
      17          he could be sentenced on that crime, committed
      18          additional crimes.   He did that in 1991, he did
      19          that again in 2001 and 2000.   He committed crimes
      20          while he was incarcerated against other prisoners.
      21          And literally in every instance, within months,
      22          maybe at most a year, after being released from
      23          incarceration, he was committing crimes again.
      24               Mr. Ward wants this Court to believe
      25          that, because the defendant is medicated now, he

1    will not engage in crime.   The presentence

2    reports from Mr. Finkler's prior federal criminal

3    convictions make clear a couple things:

4              In 2000, he stated that eight or

5    nine years before 2001, he was receiving therapy.

6    In 2000, he was diagnosed as being, at that time

7    he was diagnosed as being depressed.   He was

8    seeing a therapist.   He saw a therapist

9    additionally in 1990 -- yes, so it was 1990 he's

10   diagnosed as being depressed, and he begins

11   medication and he begins therapy.   That didn't

12   stop him from committing crime in 2001.

13             Then, again, in 2003, in the

14   presentence report that accompanied one of his

15   other federal convictions said that he suffers

16   from depression and deficit hyperactivity

17   disorder, and he's diagnosed with that and he's

18   put on Prozac at that time.

19             The point that I'm making with all

20   this is that this is not the first time the Court

21   has heard this.   This is not the first time that

22   the defendant has stood before a court and said

23   I'm getting treatment, I'm getting help, I've been

24   prescribed medication, and yet, that has not

25   stopped him from being here.

1             One of the things that's most

2    troubling is him standing up just a minute ago and

3    saying, quote, I really wish things would have

4    come to a head years ago, I really wish I would

5    have gotten divorced years ago because maybe that

6    would have brought me to my rock bottom.

7    Something needed to come to a head?   He's been

8    committing crime and being arrested for crime,

9    he's been sentenced to more than 16 years for his

10   past criminal behavior.   What more could have

11   come to a head to make him realize that he had a

12   problem and to stop this kind of conduct?

13             His son's voice in his head didn't

14   stop him from, the day he was released by this

15   Court from engaging in fraud.   The day.   Not even

16   a week, not even 24 hours, the day of his release.

17   It strikes me that this is much more than just

18   making bad choices.   This is someone who puts

19   their interest and their concerns far above those

20   of anyone else around him.

21             Mr. Ward says that he's not required

22   to see a therapist, he's not required to take

23   medication and that that is somehow an indication

24   of his commitment to self-help and healing.   I

25   suggest an alternative reasoning.   The defendant

1          is frankly a con man.  He is manipulative.  He has

2          been through the system multiple times.  He is

3          well aware of what this Court will be looking for

4          and what are the important things to say and to do

5          before a sentencing.  It's respectfully my

6          opinion he's doing that to avoid the type of

7          sentence that the government is requesting.

8                    The argument that we'll know soon

9          enough whether or not he's gotten himself on the

10         right path, well, Your Honor, that's just not good

11         enough for the government.  It's not good enough

12         for the government to say that somebody who is a

13         serial defrauder just to be allowed to go out into

14         the public after as short period of time as

15         possible, and frankly 36 months when he's already

16         been incarcerated for a little over a year, that

17         would be one of the shortest sentences he's ever

18         received.  And, generally speaking, in this

19         system, the more incarceration requests you have,

20         the more time you're getting at the end, not less.

21         It doesn't usually work the other way around.

22                    In terms of his family, as I've said

23         to this Court over and over and over again, many

24         crimes like this, we could call it a victimless

25         crime, and Sovereign Bank is a big bank, right?

1      They've got insurance.  They can figure it out,
2      I'm sure.  I'm sure that 9,800 bucks is not a big
3      drop in their bucket.  But at the end of the day,
4      the victims in this case are really the
5      defendant's family.   And if the defendant is
6      willing to ignore them and to put his interests
7      above even them, to commit crime, I don't think
8      that the average American or average Connecticut
9      resident stands much of a chance.  I think when he
10     gets out, he'll commit crime again.  I think he
11     will.  He has proven that that is the course that
12     he is going to take because he's taken it over and
13     over and over again.
14             Now, Your Honor, I don't know if you
15     want to hear on the subject of the sealed
16     supplemental memo.  It's up to you.  I defer to
17     you.  I don't have that much to say about it, so.
18     But --
19             THE COURT:   Well, I've read it, and
20     it's up to you how much you want to say in court
21     frankly.   It is something that is of concern in
22     this case frankly.
23             MS. RICHARDS:  Your Honor, all I
24     really wanted to say about it is, is that it goes
25     for us, obviously the facts that are in there go

1          to the two point adjustment for obstruction of

2          justice.   But beyond that, it makes -- as I say

3          in my memorandum, I make the statement that the

4          fraud figures that we use, they're not a proxy for

5          danger.   We are actually, we are requesting the

6          sentence because we believe the defendant to be

7          dangerous.   The basis for that is not only the

8          fact that he's a recidivist and perpetual con man,

9          but the facts that are reflected in the

10         supplemental memorandum, because to us it raises

11         the concern, it raises the concern, it raises the

12         concern about his willingness to, his willingness

13         to manipulate a system that frankly should never,

14         ever, ever be manipulated, and to put people into

15         situations that are very frightening.   And,

16         moreover, it's another instance of him -- there's

17         another part of it that deals with the fact that

18         there was some information about again engaging in

19         criminal conduct while incarcerated, which

20         obviously is something that gives the government

21         great pause.

22                 Other than that, that, I think, is

23         all we have to say on the subject, but those are

24         reasons why we think 65 months is appropriate in

25         this case.

1          MR. WARD:  The last thing I want to

2     address is the idea that, while Mr. Finkler has

3     taken medications in the past, so surely they must

4     have worked and everything would have been fine,

5     well, medicating bipolar disorder is far more art

6     than science and sometimes you have to try a lot

7     of medications before he finds the right

8     combinations.  In the past he couldn't comply with

9     them or they didn't work, but he does feel at this

10    point that he has the right combination.

11          THE COURT:   Well, let me just

12    express, so you have a chance to respond, if you

13    wish to, it's an interesting theory and hopefully

14    you're right, but what is there to indicate that

15    any crime, this or any of his prior crimes, was in

16    effect the result of his mental health status?

17          MR. WARD:  Who writes the check from

18    Wyatt and adds $6,000 to it and thinks there's not

19    going to be a consequence to that?

20          THE COURT:   Somebody who forges

21    checks and defrauds Sovereign Bank.   The fact

22    that it's a government check may make it more

23    likely a bank will accept it.

24          MR. WARD:  But for how long until

25    Wyatt realizes, wait a minute, we wrote a check

1      for 40 dollars, not 6,040 dollars.  I mean that

2      has no subtlety to it.  It's deposited directly

3      into his account.

4                THE COURT:   It's written out to him.

5      He saw an opportunity, he had a check for $22 made

6      out to him, he changed it to $6,022 and he

7      deposited it.  What else is he going to do with

8      it?  If he wants to get any money, if he wants to

9      defraud anybody with that check, the only way to

10     do it is to change the amount of the check and

11     deposit it and hope that some period of time goes

12     by.

13                MR. WARD:  But that's such a lame

14     crime to commit.  No -- I mean a police officer

15     who is one day out of the academy can solve that

16     crime.

17                THE COURT:   Who goes into a carpet

18     dealer with a $55,000 bad check, takes carpets

19     away and comes back the next day with a $230,000

20     bad check and takes carpets away?   That's not a

21     sophisticated crime either.

22                MR. WARD:  No, and that's my point.

23     I think these are all -- that's like the police

24     officer who walks into the car dealership and

25     writes a check for 72,000 dollars and drives off

1      with the car.  It's not a well ordered mind that
2      thinks that somehow that's going to work.  That
3      is my point, that I think these are the products
4      of an impulsive kind of manic phase.
5                  THE COURT:  So were the carpet
6      dealer; he has impulses three days in row.
7                  MR. WARD:  Manic phases can last for
8      a week or more.
9                  THE COURT:  All right, you get my
10     point.
11                 MR. WARD:  I do, I do.
12                 THE COURT:  I mean, it's putting a
13     lot of weight on a thin reed to say his mental
14     condition -- a lot of people are bipolar, not a
15     lot of people are doing what Mr. Finkler does over
16     and over and over again.
17                 MR. WARD:  But it's not common either
18     with bipolar people to have them in court on these
19     kinds of crimes where they are so, so incredibly
20     easy to solve, that somehow there's a lack of
21     connection in the mind.
22                 THE COURT:  Almost any bad check
23     fraud is very easy to solve.  The fact that it's
24     easy -- bank robberies are very easy to solve.
25     People walk to the bank, people see their face,

1      the cameras take pictures of them.  They walk out

2      with money.  The fact that it's easy to solve

3      doesn't mean it's a product of a mental illness.

4                  MR. WARD:  I would submit most, if

5      not all, of the bank robberies that I represent,

6      all have significant mental illnesses.  It is a

7      silly crime to commit, and it's because of that.

8                  THE COURT:  People that sell drugs

9      on the street are out there in public passing

10     drugs from hand to hand.  It's an easy crime to

11     uncover, to solve, to arrest somebody for and,

12     yet, it happens.  It can't be that Mr. Finkler's

13     conduct, including what we talked about in terms

14     of the sealed supplemental memorandum, it just

15     can't all be based on his mental condition.  I

16     just really have trouble accepting that.

17                 MR. WARD:  I would submit that the

18     mental condition contributes strongly to this

19     behavior.  It may not be entirely responsible but

20     it certainly contributes to the behavior.

21                 THE COURT:  Well, I understand

22     that's your point of view, but I mean, I don't

23     have any basis for understanding that to be the

24     case.  Other than the fact that he's been

25     diagnosed as bipolar, I have nothing to connect

1          that condition to any of these crimes.   Do I?
2          Other than --
3                    MR. WARD:  The circumstances of the
4          crimes.
5                    THE COURT:   -- your conjecture.
6                    MR. WARD:  Okay.  I don't know how
7          anyone could ever prove that otherwise, but.
8                    THE COURT:  I'm not saying it's easy
9          but he has a documented mental health history.
10                    MR. WARD:  Right.
11                    THE COURT:  Is there anything there
12          that anybody has ever said, hey, you know what?
13          All we have to do is solve this problem and he's
14          going to stop ripping people off?
15                    MR. WARD:  No, but I don't think
16          that's ever the case.
17                    THE COURT:  Well, I do see
18          occasionally -- I don't always accept them but I
19          see occasionally some evaluation, this contributed
20          to his decision to commit this offense.  What I
21          have is a man who is anxious and depressed, who
22          has bipolar, and who has, you know, a string of
23          convictions and other arrests that takes pages and
24          pages and pages to describe.  You know, you
25          present a theory but I think it's a theory.

```
1                    MR. WARD:  I understand, Your Honor.
2                    THE COURT:   I mean there are a lot
3          of people out there who commit crime after crime
4          after crime after crime who, it's the thrill or
5          it's the need for the money or it's whatever it
6          is.   But how can I say, look back at this record
7          and say, oh, if only he had gotten this drug back
8          when he was 18-years old.
9                    MR. WARD:  I will go back to the
10         check.  Usually in check cases, people go through
11         elaborate efforts to disguise who the real
12         recipient of the money is going to be, they don't
13         write the check to themselves.  And again, with an
14         astonishing number, at Wyatt, how many $6,000
15         checks does Wyatt write to inmates?  I mean it's
16         from a commissary account.
17                    THE COURT:   Well, the person he has
18         to fool is the cashier at the bank.
19                    MR. WARD:  Well, but he has to fool
20         more than that.  That check will go back to Wyatt
21         within 24 hours of being cashed and Wyatt is going
22         to say, wait a minute.
23                    THE COURT:   But that's after he gets
24         paid.  It goes back to the bank after it's been
25         processed.   So he's happy.
```

```
 1                    MR. WARD:  With no regard for the
 2        consequence of that?
 3                    THE COURT:   He's happy to write
 4        checks that don't get processed.  Sovereign was
 5        the only one of the crimes we're talking about now
 6        that worked.  The others --
 7                    MR. WARD:  Were so obviously bad.
 8                    THE COURT:  -- obviously intended
 9        fraud.
10                    MR. WARD:  Right.
11                    THE COURT:   Right.
12                    MR. WARD:  You don't think a person
13        that, a person who writes something so obviously
14        bad a bank won't even look at it doesn't have a,
15        some mental impairment going on, that it doesn't
16        contribute to the idea that you could write a
17        check and expect to get money for it and not get
18        caught for it?   There's something wrong here,
19        Your Honor.  It's not just, you know, that he's an
20        evil person and he's gone out and written checks.
21        There's something wrong with that thought process.
22                    THE COURT:   Well, what's wrong,
23        presumably, is he is somebody who doesn't care
24        about the consequences.  He wants to have the
25        thrill or the cash, whatever it is, he can get
```

1     from it.  And maybe I won't get caught, maybe they

2     won't find me, maybe I'll spend the money.  He's

3     had some episodes where he was able to spend the

4     money.  He's had credit card frauds.  He spent a

5     lot of money.  Did anybody ever get anything back

6     from that?  So, he got what he wanted.  He got

7     the benefit.  I just, I don't sense there's a

8     connection between act and consequence, and

9     whether that's due to he's a sociopath or whether

10     that's due to his mental health, I don't know

11     really that at this point it matters too much,

12     because when you have somebody with this kind of

13     record, it comes down to protecting the public.

14     There are very few cases where I'm of that view.

15     Very few.

16           I am, as Ms. Richards suggested, I am

17     an optimist.  I am somebody who cares about

18     rehabilitation, but there comes a point where

19     whatever is causing him to do what he does, the

20     public has to be protected.  Who's next?  Who's

21     next?  If it's bipolar, if it's sociopath, if

22     it's thrill seeker, if it's somebody who just

23     doesn't care, whatever it might be, he's going to

24     get out of jail, and it may not be within

25     24 hours, but very quickly, I believe he's going

1     to do the same thing or something very similar

2     again.

3                    MR. WARD:  Or maybe not.   Or maybe

4     not.  Maybe this is the right approach that he has

5     now.

6                    THE COURT:   I hope it is.  And if it

7     is, that's great, because he will not be sent to

8     prison for violating the law again.  We as a

9     society will not have to pay for him to be housed,

10    which is a huge waste, and maybe he can do the

11    things he's talking about in terms of getting

12    reconnected with his family and so forth.  But

13    that "maybe" is a, given everything I know about

14    Mr. Finkler, that's a very weak "maybe."  That's

15    the problem.

16                    MR. WARD:  Again, Your Honor, I'm not

17    suggesting that he doesn't get a jail sentence.

18    I'm suggesting you punish him, I just don't think

19    we need to go 65 months to make a point.

20                    THE COURT:   Right, right.  But, you

21    know, punishment has not really worked in the past

22    and, again, we're at the point where, who's next?

23    You know, he's got to pay his therapist.   I mean

24    if you weren't retained, he wouldn't pay you.

25                    You know me very well, you know my

1       approach to sentencing very well, you know I'm all

2       about how much hope do I have.  I heard that in

3       your remarks today and the problem is I don't have

4       much hope for Mr. Finkler.  I mean it's been

5       crushed.  It's conviction after conviction after

6       conviction.   The speed with which he does it, the

7       fact that he's done it several times while on

8       supervised release, the whole sealed supplemental

9       episode, he'll do whatever and say whatever is

10      going to get him ahead at that moment and the

11      public needs to be protected.

12                  MR. WARD:  I would just add, Your

13      Honor, that if the government were right and this

14      is just, oh, he should, you know, come up with

15      something to say at sentencing to convince the

16      court that he's changed his ways, this is a

17      sustained effort.  He's been seeing Rabbi for

18      almost a year, he's been on medication for

19      18 months.  So, it's sustained.  It's hard to

20      carry that off if you don't real mean it.

21                  THE COURT:  All right, thank you.

22                  Mr. Finkler, I've spent a good deal

23      of time thinking about your case and preparing for

24      sentencing today, and I -- well, you've already

25      heard some of my thoughts about you, but I want to

1     explain the reason for my sentence to you.

2                    Let me just note for record I've

3     considered all the factors in 3553(a).   The way I

4     sometimes like to explain a sentence is by talking

5     about the four recognized purposes of sentencing.

6                    Punishment for wrongdoing.   I think

7     you seem to acknowledge you need to be punished

8     for what you did.

9                    Deterrence of you and others.

10    Frankly I'm not a big fan of general deterrence

11    but I think specific deterrence is sometimes

12    important.

13                    Rehabilitation.   Everybody wants

14    every defendant to benefit from the sentence and

15    to come away from the service of that sentence a

16    better person, a person better able to avoid

17    breaking the law in the future, better able to be

18    there for your family, better able to get

19    employment, et cetera.   And that's part of every

20    sentence.

21                    And in the rare case, and I think

22    this is a rare case, the need to protect the

23    public from further harm.

24                    And when I look at those purposes,

25    they are usually in opposition to each other, so

1          that the need for rehabilitation fights against

2          the need to punish or the need to protect the

3          public, but it's not clear to me they are in

4          opposition in your case.  I feel like even the

5          need for rehabilitation calls for a longer

6          sentence in your case, longer time for you to

7          reflect on what got you here.  You've begun

8          understanding what went wrong in your past but I

9          think you need to come to terms with -- and,

10         again, you've started this -- come to terms with

11         your role in that.

12                  You know, you described your concern

13         about being there for your son.  Well, you were in

14         jail many of the years of his childhood, and so

15         you need to really, you can't move forward until

16         you accept responsibility for what you've done and

17         figure out how to deal with that and move forward.

18         So, you're going to get some counseling in prison.

19         I hope you take advantage of that.  You don't have

20         to but it's there for you and you'll be a better

21         person if you take advantage of that.

22                  But the things that are driving your

23         sentence here today are the other three purposes:

24         The need to punish.  You're somebody who keeps

25         doing the same wrongful conduct over and over, and

1     you need to learn from your mistakes.  You haven't

2     yet.  I'm hoping that this sentence will help you

3     do that.  But you need to be deterred, you need to

4     understand the sentences are going to get longer,

5     they are not going to get shorter.  No judge with

6     your record is going to look at you and say, oh,

7     I'm optimistic that he understands things now.

8     You're way past that point.  You're at the point

9     where every time you come into court, if you ever

10    come into court again, you're going to be looking

11    at what is the most that the judge can do to

12    punish you, to deter you, and to protect the

13    public from you.

14                The public needs to be protected from

15    you.  I'm sorry to say that it's true.  You have,

16    you're your entire adult life, ripped people off.

17    Your entire adult life, you have lied to people.

18    Your entire adult life, you have put your desire

19    for monetary benefit ahead of harm to other

20    people.  Some of these people, some are entities,

21    credit card companies, banks.  I understand that

22    that's less significant than ripping off an old

23    lady, but the point is you're putting yourself

24    first, without regard to anybody else, your

25    victims, your family, anybody, and you need to

1    understand that that approach to life will get you

2    a lot more time in a box with bars on it.  Prison

3    is inhuman.  I wish we had far fewer prisons than

4    we have, but I'm convinced that if we have prisons

5    you're somebody who should be in one, because you

6    have an unbroken record of fraud and hurt and harm

7    everywhere you've ever gone.

8              So, I say that to explain the

9    sentence you're going to receive.  I also want you

10   to walk out of here today with a firm resolve to

11   do what you have told me you are going to do.

12   Now, maybe your words to me have no more force

13   than statements you've made to other people to

14   fool them.  I hope you have reached rock bottom.

15   I hope you are climbing out.  I hope you have

16   decided to change and I hope your medication does

17   help you do that, but that's all up to you.

18   Nothing I do, nothing Mr. Ward can do, nothing the

19   Rabbi can do, can help you unless you are

20   determined to make it happen.  So you, while

21   you're in prison, you need to figure that out.

22              THE DEFENDANT:  I understand.

23              THE COURT:  If this is rock bottom,

24   you have two paths ahead of you.  You have the

25   path of redemption, you have the path of return to

1           your family, you have the path of responsibility.

2           You have the difficult path, frankly, of actually

3           earning money and making hard decisions and doing

4           what everybody else seems to have to do to get

5           through this life.

6                    Or you can go back and do what you've

7           done in the past.  And if you do, you'll be

8           wearing khaki and you'll be in a box for a long

9           time.  I don't want that.  I don't want that.

10          Nobody wants that.  But, again, that's your

11          choice.  It's your choice.  I hope you reflect

12          on that.  I hope you make good choices in the

13          future.  I hope never to see you in court again.

14          You know, if you get out of prison and you do

15          something like this again, I'm the first judge

16          you're going to see, because you're going to be on

17          supervised release, so you're going to be right

18          back here and I'll know at that point what to do

19          because I'll know what choice you've made.  It's

20          not some other judge you're going to be able to

21          talk your way through something.  It's going to be

22          me.  So keep that in mind.  I hope that helps you

23          because you don't have any, you don't have any

24          room to deviate.  You're right up against the

25          cliff.  If you move the wrong way a little bit,

1    you've got a long way to fall.  Okay?  So, you've

2    got to back up now and do the hard work.  If you

3    want to be a good father, you have to be employed,

4    you've got to be a good citizen, you've got a lot

5    of hard work ahead of you.

6              You can do it.  You're a smart guy.

7    People, some people have faith in you.  Your

8    wife -- your ex-wife, your Rabbi, your lawyer.

9    I'm hoping that that faith is not misplaced.  I'm

10   hoping you get your act together and make the

11   right decisions, but right now I've got a job to

12   do and my job is to sentence you, and essentially

13   for the reasons I've stated, it's my intention to

14   sentence you as follows:

15             To a period of incarceration on the

16   underlying conviction of 36 months, and to a

17   period of incarceration on the supervised release

18   violation of 24 months, for a total effective

19   sentence of 60 months, obviously with credit given

20   for the time you've already spent in federal

21   custody.

22             Following your release from prison,

23   you're going to be on supervised release for a

24   total period of five years, and that's on the

25   underlying conviction, and one year on the

1         supervised release term.  Those are, those periods

2         of supervised release are going to run

3         concurrently so, in effect, you have a total of

4         five years on supervised release.

5                    During the period of supervised

6         release, the mandatory conditions of supervised

7         release set forth at Guideline Section 5d1.3a, 1,

8         that you not commit another federal, state or

9         local offense; 2, that you not unlawfully possess

10        controlled substances; 4, that you refrain from

11        unlawful use of controlled substances and submit

12        to drug testing; 6B, that you pay the special

13        assessment imposed; and 8, that you cooperate in

14        the collection of a DNA sample will all be

15        imposed, as will the standard conditions of

16        supervised release set forth at Guideline Section

17        5d1.3c.

18                   As special conditions of supervised

19        release, I'm ordering first that you participate

20        in a program approved by the Probation Office for

21        mental health treatment, and that you pay all or a

22        portion of the costs associated with that

23        treatment based on your ability to pay in an

24        amount to be determined by the probation officer.

25                   Secondly, that you pay the

1  restitution which I noted before to Sovereign Bank

2  in the total amount of $9,828.83, and that you pay

3  any unpaid portion at the rate of no less than

4  $100 per month during the period of supervised

5  release.  That payment schedule can be adjusted

6  upwardly or downwardly based on your ability to

7  pay as determined by the probation office and

8  approved by the Court.

9           Third, that you shall not incur new

10  credit card charges or open additional lines of

11  credit without permission of the probation officer

12  until your criminal debt obligation, that is, your

13  restitution is paid in full.

14           Fourth, that you provide the

15  probation officer with access to requested

16  financial information.

17           Fifth, that, as directed by the

18  probation officer, you shall notify third parties

19  of risks that may be occasioned by your criminal

20  record or personal history or characteristics, and

21  shall permit the probation officer to make such

22  notifications and to confirm your compliance with

23  such notification requirement.

24           And, finally, that you not possess a

25  firearm, destructive device or other dangerous

1       weapon.

2                   I want to remind you that the

3       violation of any of those terms or conditions will

4       subject you to up to three more years in prison,

5       and, as I said before, you'll come here for that

6       determination.

7                   I'm going to waive a fine in this

8       case based upon a finding that you cannot afford

9       to pay a fine within the guideline range.  I am

10      ordering restitution to Sovereign Bank in the

11      amount previously stated and I'm required to

12      impose an mandatory special assessment of 100

13      dollars on the underlying conviction.

14                  Let me hear from either counsel if

15      there's any reason why the sentence I just

16      described cannot lawfully be imposed as the

17      sentence of the Court in this case.

18                  MS. RICHARDS:  Nothing from the

19      government, Your Honor.

20                  MR. WARD:  No, Your Honor.

21                  THE COURT:   All right.  Mr. Finkler,

22      the sentence I just described is hereby imposed as

23      the sentence of the Court in your case.  The

24      judgment will be prepared for the Court, and the

25      filing of that judgment will start the clock

1          running on your time to file a Notice of Appeal.

2          You have 14 days from the entry of judgment within

3          which to file a written Notice of Appeal with this

4          court.   Do you understand the time limit on your

5          right to file a Notice of Appeal?

6                    THE DEFENDANT:   Yes, I do, Your

7          Honor.

8                    THE COURT:   All right.   I want to

9          remind you that in your plea agreement you agreed

10         to waive your right to appeal or to collaterally

11         attack both your conviction and your sentence

12         under certain circumstances.   Those circumstances

13         appear to have been met and, therefore, it appears

14         to me that you have validly waived your right to

15         appeal or validly attack both your conviction and

16         sentence.   I'm advising you of your right to

17         appeal in the event that you believe there's some

18         fundamental defect in these proceedings that has

19         not been waived by your plea agreement.   Do you

20         understand that?

21                   THE DEFENDANT:   Yes, I do.

22                   THE COURT:   If you wish to appeal

23         but you cannot afford to do so, you can file a

24         motion to proceed in forma pauperis.   If that

25         motion is granted, the Court will waive its filing

1         fee for your appeal and will appoint a lawyer to

2         handle your appeal at no cost to you.  Do you

3         understand that?

4                     THE DEFENDANT:   Yes, I do, Your

5         Honor.

6                     MR. LOPEZ:  Your Honor, excuse me, in

7         terms of the, with respect to the one year term of

8         supervised release, on the revocation sentence,

9         I'm believing it should be the original terms of

10        supervised release originally imposed in that case

11        should be reimposed.  Maybe defense counsel and

12        the parties can help me out with this.  I know

13        that was wire fraud, an attempted wire fraud case.

14        I don't know if there was any reduction that was

15        ordered that may still be outstanding, but

16        typically I think the Court would reimpose that

17        under the same conditions.

18                     THE COURT:   Yes, that's a good

19        point.  Any objection to modifying the sentence

20        just described to include that the original

21        supervised release conditions from the prior

22        conviction will be reimposed in the first year of

23        supervised release?

24                     MR. WARD:  No objection, Your Honor.

25                     MS. RICHARDS:  No, Your Honor.

1                    THE COURT:   All right, that's what
2        I'm going to order.   Thank you.
3                    MR. WARD:   Your Honor, would the
4        Court please put in the judgment the
5        recommendation to the Bureau of Prisons for
6        alternative choices for designation, that is, Fort
7        Devins as the first option so that he might engage
8        in mental health counseling there and so he can be
9        close to his family, and his as an alternative,
10       FCI Otisville, which would also be relatively
11       close to permit some visits?
12                    MS. RICHARDS:   Your Honor, the
13       government doesn't have an objection to him being
14       close to his family.   Obviously the one concern
15       with that is Mr. Finkler has had a history of, one
16       confirmed situation in which he was convicted of
17       defrauding a fellow prisoner, and then there has
18       been recent allegations with respect to defrauding
19       a fellow prisoner while he was at Wyatt.   I don't
20       know whether or not putting him in a secured
21       facility where he could basically commit the same
22       types of crimes against inmates would be a good
23       idea.   I don't know what alternatives there are to
24       that but it strikes me that, at the very least,
25       the Bureau of Prisons needs to be aware of the

```
1        fact that he has this history and be able to
2        monitor him appropriately.
3                    THE COURT:   Well, I think they are
4        aware through the PSR.
5                    MS. RICHARDS:  Okay.
6                    THE COURT:   Which will follow him.
7        And so I think that's probably the best we can do
8        frankly.
9                    MS. RICHARDS:  Okay.
10                    THE COURT:   But I will make the
11        recommendation that's been requested.
12                    MR. WARD:   Thank you, Your Honor.
13                    THE COURT:   Anything further?
14                    MS. RICHARDS:  Your Honor, if I may
15        file the original plea agreement?
16                    THE COURT:   Oh, yes, please.  Thank
17        you.
18                    MS. RICHARDS:  May I approach?
19                     (Hands Clerk)
20                    THE COURT:   Mr. Finkler, I hope
21        you're at a turning point in your life.  I hope
22        everything you've said to me today is true and
23        that you're able to put it into practice, and I
24        wish you and your family the best.
25                    We'll stand in recess.
```

1                    (Court adjourned at 3:20 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3        UNITED STATES DISTRICT COURT

 4        DISTRICT OF CONNECTICUT

 5                    I, SUSAN E. CATUCCI, R.M.R., Official

 6        Court Reporter, do hereby certify that I was

 7        authorized to and did report the foregoing

 8        proceedings before the Court at the time and place

 9        aforesaid; and that the preceding pages numbered

10        from 2 to 57, inclusive, represent a true and

11        accurate transcription of my stenographic notes

12        taken at said proceedings.

13                    IN WITNESS WHEREOF, I have hereunto

14        affixed my official signature this 20th day of

15        September, 2019.

16

17

18

19                        //S_____

20                          Susan E Catucci, RMR

21

22

23

24

25
```

SUSAN E. CATUCCI, R.M.R. AND OFFICIAL COURT REPORTER